Jonathan S. Caplan
Aaron Frankel (*pro hac vice* to be filed)
**KRAMER LEVIN NAFTALIS**
 **& FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
Tel.: (212) 715-9100
jcaplan@kramerlevin.com
afrankel@kramerlevin.com

Paul J. Andre (*pro hac vice* to be filed)
Lisa Kobialka (*pro hac vice* to be filed)
James Hannah (*pro hac vice* to be filed)
Jennifer L. Gilbert (*pro hac vice* to be filed)
Carlos J. Tirado (*pro hac vice* to be filed)
**KRAMER LEVIN NAFTALIS**
 **& FRANKEL LLP**
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel.: (650) 752-1700
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
jgilbert@kramerlevin.com
ctirado@kramerlevin.com

*Attorneys for Plaintiff WinView IP Holdings, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WINVIEW IP Holdings, LLC, a Delaware corporation, | ) ) ) Civil Action No. 25-CV-1143 |
| Plaintiff, | ) ) **COMPLAINT FOR PATENT** ) **INFRINGEMENT** |
| v. | ) ) **JURY TRIAL DEMANDED** |
| DRAFTKINGS INC., a Nevada corporation, DK CROWN HOLDINGS INC., a Delaware corporation, CROWN GAMING INC., a Delaware corporation, SBTECH US INC., a Delaware corporation, and SBTECH (GLOBAL) LTD., an Isle of Man registered company, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## L. CIV. R. 10.1 STATEMENT

The address of Plaintiff WinView IP Holdings, LLC ("WinView") is 7804-C Fairview Road, Suite 207 Charlotte, North Carolina 28226.

The address of Defendants DraftKings Inc., a Nevada corporation ("DraftKings Inc."), DK Crown Holdings Inc., a Delaware corporation ("DK Crown Holdings"), and Crown Gaming Inc., a Delaware corporation ("Crown Gaming") is 111 River Street, Hoboken, New Jersey 07030, with additional locations in New Jersey as set forth herein.

The address of Defendant SBTech US Inc. ("SBTech US"), a Delaware corporation, is 3993 Howard Hughes Parkway, Las Vegas, Nevada 89169.

The address of Defendant SBTech (Global) Ltd. ("SBTech Global"), an Isle of Man registered company, is 33-37 Athol Street Douglas, Isle of Man IM1 1LB, IM.

Hereinafter, SBTech US, and SBTech Global will be collectively referred to as "SBTech."

Hereinafter, DraftKings Inc., DK Crown Holdings, Crown Gaming, and SBTech will be collectively referred to as "Defendants" or "DraftKings."

WinView, by and through its undersigned counsel, complains against DraftKings and alleges as follows:

1.    WinView is seeking to protect its valuable intellectual property from DraftKings' ongoing willful infringement.    WinView developed and patented novel technology that transformed various aspects of online and mobile gaming, including daily fantasy games, live sports betting, and online casino games, also known as iGaming.  On multiple occasions, WinView contacted DraftKings to notify it about WinView's patented technology and unique sports skill-based platform, discuss potential partnerships, and attempt to engage DraftKings in a partnership or investment which would exploit WinView's patents and its paid-entry sports betting games of skill.  DraftKings chose to willfully infringe WinView's patents rather than partner with WinView, necessitating this action.

## NATURE OF THIS ACTION

2.    This is an action for patent infringement arising under 28 U.S.C. § 1331 and the United States Patent Act, 35 U.S.C. § 100 *et seq*.  WinView seeks damages and other relief from DraftKings for its willful infringement of WinView's asserted patents by its gaming offerings and related mobile applications.

## THE PARTIES

3.    Plaintiff WinView is a limited liability company duly organized and existing under the laws of the State of Delaware.  WinView is located at 7804-C Fairview Road, Suite 207 Charlotte, North Carolina 28226.  WinView is a wholly-owned subsidiary of WinView Technology Inc., a corporation organized and existing under the laws of Delaware, headquartered at 7804-C Fairview Road, Suite 207 Charlotte, North Carolina 28226.  WinView Technology, Inc.

offers proprietary application platform features including ultra-low latency streaming.  Ex. 10 at 2 [https://winviewtechnology.com/about/].

4.      WinView's patent portfolio includes leading technological innovations in mobile gaming and interactive television, covering various aspects of immersive live sports betting and viewing.  WinView's technologies enable the creation of an online and mobile environment that enhances the sports viewing and gaming experience, making it more engaging and more exciting for customers, while eliminating unfair competitive advantages.  Its technologies enable technical advances which increase FanDuel's customer base and wagering opportunities and enable compliance with state and federal gaming and Daily Fantasy rules and regulations.  Using WinView's patented technology, sports fans across the country can watch sports on television, enter contests, and compete against other fans as the action unfolds, winning cash and other prizes utilizing any Internet-connected device.

5.      WinView's extensive portfolio of United States patents includes U.S. Patent Nos. 11,185,770,   11,235,237,   11,338,189,   11,451,883,   11,678,020,   11,736,771,   11,918,880, 11,951,402, and 12,005,349 (collectively, the "Asserted Patents").  WinView is the owner by assignment of all right, title, and interest in the Asserted Patents.

6.      DraftKings is a digital sports entertainment and gaming company.  DraftKings provides users with daily fantasy sports, online sports betting, and casino-style gambling offerings. DraftKings is also involved in the design, development, and licensing of sports betting and casino gaming software for online and retail sportsbook and casino gaming products.  For example, DraftKings offers the DraftKings Sportsbook online at sportsbook.draftkings.com and a DraftKings Sportsbook application for mobile devices.  DraftKings also offers Daily Fantasy Sports online at draftkings.com and a DraftKings Daily Fantasy Sports application for mobile

devices. DraftKings has provided and continues to provide websites and related software, products, and services that infringe the Asserted Patents without authorization from WinView.

7. DraftKings Inc., DK Crown Holdings, Crown Gaming, and Crown NJ Gaming operate and do business under the names "DraftKings" and "DraftKings Sportsbook at Resorts Casino." *See* Ex. 11 ([Petition Continue To Conduct Internet Gaming And Sports Wagering In NJ](Petition Continue To Conduct Internet Gaming And Sports Wagering In NJ)) (listing Resorts Casino Hotel and Crown NJ Gaming Inc. parties to the PRN 0582404 agreement for casino service industry licensure) and Ex. 12 ([DraftKings Sportsbook at Resorts marketing page](DraftKings Sportsbook at Resorts marketing page)). DK Crown Holdings provides daily fantasy sports, online sports betting, and casino-style gambling services solely for DraftKings offerings. Crown Gaming provides sports betting services solely for DraftKings offerings. Specifically, Crown Gaming operates sports and other betting games for DraftKings, through electronic, interactive, and technological means (including the Internet).

8. DraftKings markets, advertises, sells, and offers to sell the infringing DraftKings Sportsbook and DraftKings Daily Fantasy Sports products, services and mobile applications through its root website domain draftkings.com, which includes the subdomains draftkings.com, casino.draftkings.com, and sportsbook.draftkings.com. DraftKings' website and mobile applications prominently use the names "DraftKings," "DraftKings Sportsbook," and "DraftKings Daily Fantasy Sports." DraftKings' DraftKings Sportsbook and Daily Fantasy Sports websites and mobile applications are effectuated by and attributable to DraftKings.

9. SBTech designs, develops, and offers sports betting and gaming technology platforms and services for both online and brick-and-mortar retailers. Ex. 13 at 5 (DraftKings 10-K). SBTech's technology serves as the backbone of the DraftKings Sportsbook and Casino services. SBTech's platforms include pre-match and in-game betting, odds management, live

streaming, casino and virtual sports content and unified wallet features.  Ex. 14 (SBTech Betting Platform).

10.     DraftKings Inc. is a corporation duly organized and existing under the laws of the State of Nevada, having executive offices at 222 Berkeley Street, Boston, Massachusetts 02116, and having regular and established places of business at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and 1133 Boardwalk, Atlantic City, New Jersey 08401.

11.     DraftKings Inc. is a publicly traded company.  DraftKings Inc.'s public securities filings, including the 10-K for the fiscal year ended December 31, 2023 ("DraftKings' 10-K"), describe the activities and business of DraftKings Inc. and informed the public that in DraftKings Inc.'s securities filings, the terms "'DraftKings,' 'we,' 'our,' and 'us' and similar terms refer to DraftKings Inc., . . . together with its consolidated subsidiaries."  *See* Ex. 13 at 3 (DraftKings' 10-K).

12.     DraftKings, Inc., in its current form, was created when Diamond Eagle Acquisition Corp, a special purpose acquisition company (SPAC), acquired the predecessor DraftKings, Inc. and SBTech, creating a vertically integrated company.  Ex. 15 (https://www.draftkings.com/news-2019-12-23-draftkings-to-become-public-company-creating-the-only-vertically-integrated-u-s). Prior to the acquisition, DraftKings, Inc. focused solely on its Daily Fantasy offerings and SBTech offered business-to-business services that provided sportsbook and in-play betting products and its iGaming platforms to customers.  Currently, SBTech's technology is the core technology behind DraftKings' sportsbook platform, which helped DraftKings move beyond daily fantasy sports into the broader realm of online sports betting and iGaming.

13.    DK Crown Holdings is a corporation duly organized and existing under the laws of the State of Delaware, having executive offices at 222 Berkeley Street, Boston, Massachusetts 02116, and having regular and established places of business at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and 1133 Boardwalk, Atlantic City, New Jersey 08401.  DK Crown Holdings is a wholly-owned subsidiary of DraftKings, Inc.  Ex. 13 (DraftKings 10-K) at Exhibit 21.1 (showing DK Crown Holdings is 100% owned by DraftKings).

14.    Crown Gaming is a corporation duly organized and existing under the laws of the State of Delaware, having executive offices at 222 Berkeley Street, Boston, Massachusetts 02116, and having regular and established places of business at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and 1133 Boardwalk, Atlantic City, New Jersey 08401.  Crown Gaming is a wholly-owned subsidiary of DraftKings Inc.  Ex. 13 (DraftKings 10-K) at Exhibit 21.1 (showing Crown Gaming is 100% owned by DraftKings).

15.    Crown NJ Gaming, Inc. ("Crown NJ Gaming") is a corporation existing under the laws of the State of Delaware, and having regular and established places of business at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and 1133 Boardwalk, Atlantic City, New Jersey 08401.  Crown NJ Gaming is a wholly-owned subsidiary of DraftKings Inc.  Ex. 13 (DraftKings 10-K) at Exhibit 21.1 (showing Crown NJ Gaming is 100% owned by DraftKings).

16.    SBTech US is a corporation duly organized and existing under the laws of the State of Delaware, having regular and established place of business at 3993 Howard Hughes Parkway, Las Vegas, Nevada 89169 and 222 Berkeley Street, Boston, MA 02116.  SBTech US is a wholly-

owned subsidiary of DraftKings Inc.  Ex. 13 (DraftKings 10-K) at Exhibit 21.1 (showing SBTech US is 100% owned by DraftKings).

17.    SBTech Global is a registered company duly organized and existing under the laws of Isle of Man, having executive offices and a regular and established place of business at 33-37 Athol Street Douglas, Isle of Man IM1 1LB, IM.  SBTech Global is a wholly-owned subsidiary of DraftKings Inc.  Ex. 13 (DraftKings 10-K) at Exhibit 21.1 (showing SBTech Global is 100% owned by DraftKings).

18.    DraftKings operates through a number of related corporate entities, including DraftKings Inc., DK Crown Holdings, and Crown Gaming, which are also alter egos of one another, such that DraftKings operates as a consolidated and joint enterprise, and the acts of one Defendant are attributable to the others for purposes of the matters alleged herein.

19.    DraftKings Inc.'s typical organizational structure for a state's operation is depicted below.  Specifically, this example covers DraftKings Inc.'s operations in the state of Massachusetts.  DraftKings, Inc. operates with the same structure in New Jersey, with Crown NJ Gaming LLC in the place of Crown MA Gaming LLC.



Ex. 16 (MassGaming Commission Submission) at 12 (https://massgaming.com/wp-content/uploads/DraftKings-redacted.pdf).

20. DraftKings Inc. exercises complete domination over DK Crown Holdings and Crown Gaming such that DK Crown Holdings and Crown Gaming lack any separate corporate existence and function as mere instrumentalities of DraftKings Inc.

21. Defendants DraftKings Inc., DK Crown Holdings, and Crown Gaming share corporate offices and operate out of the same facilities, having regular and established places of business at least in New Jersey and Massachusetts at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; 1133 Boardwalk, Atlantic City, New Jersey 08401; and 222 Berkeley Street, Boston, Massachusetts 02116.

22. Crown Gaming holds New Jersey licenses on behalf of DraftKings via Crown NJ Gaming.  DraftKings Inc., DK Crown Holdings, and Crown Gaming control and dominate Crown NJ Gaming (and other entities that hold licensing registrations in states where DraftKings'

gambling operations have been legalized, like "Crown NY Gaming Inc." and "Crown PA Gaming Inc."). Crown Gaming and Crown NJ Gaming share directors, officers, and facilities. Crown NJ Gaming is a mere alter ego, agent, and instrumentality of Crown Gaming, and in turn DraftKings Inc. and DK Crown Holdings. Crown NJ Gaming, in tandem with and under the control and direction of DraftKings Inc., DK Crown Holdings, and Crown Gaming, operates a retail location called the DraftKings Sportsbook at Resorts Casino, located at 1133 Boardwalk, Atlantic City, New Jersey 08401.

23. The DraftKings website is administered and operated by DraftKings. DraftKings' website also lists a "US Office" at 222 Berkeley Street, Boston, MA 02116 and a "New Jersey Office" with a mailing address at PO Box 399, Hoboken, NJ 07030. DraftKings' website states that "Located in Hoboken, New Jersey, this office is home to our Customer Experience, Compliance, and Fraud teams." Ex. 17 (Our Office in Hoboken)

24. The same individuals hold positions as officers and directors of DraftKings Inc., DK Crown Holdings, and Crown Gaming. For example, Mr. Paul Liberman is a co-founder and the President, Global Technology and Product, of DraftKings Inc., DK Crown Holdings, and Crown Gaming. DraftKings describes Mr. Liberman as "instrumental" in leading the development of the DraftKings Daily Fantasy Sports application and the DraftKings Sportsbook platform. In addition, R. Stanton Dodge is the Chief Legal Officer and Secretary for DraftKings Inc. and Secretary for DK Crown Holdings and Crown Gaming.

## JURISDICTION AND VENUE

25. This action for patent infringement arises under the patent laws of the United States, 35 U.S.C. § 101 *et seq.* This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1338.

26.     This Court has personal jurisdiction over DraftKings Inc., DK Crown Holdings, and Crown Gaming because they have availed themselves of the legal protections of the State of New Jersey by, among other things, maintaining a physical presence and regular places of business in New Jersey, conducting business in the State of New Jersey, and engaging in continuous and systematic infringing activities in the District of New Jersey.  Indeed, the New Jersey office location is listed as one of DraftKings' offices, and one of the two Sportsbook US offices, which are a subject of the instant action for infringement.  *See* Exs. 18 (Our Offices in the US), 17 (Our Office in Hoboken), 19 (Who We Are); and Ex. 20 at 2 (Sportsbook Homepage).  In addition, DraftKings' public securities filings specify that DraftKings operates its Sportsbook and online casino ("iGaming") product offerings in New Jersey.  *See* Ex. 13 (DraftKings 10-K) at 9.

27.     This Court also has personal jurisdiction over DraftKings Inc., DK Crown Holdings, Crown Gaming, SBTech Global, and SBTech US, because they make, use, offer for sale, and sell products and services in the District of New Jersey and have committed and continue to commit acts of infringement in the District of New Jersey.  Further, they derive substantial revenue from the acts of infringement in the District of New Jersey and derive substantial revenue from interstate and international commerce associated with the infringing products.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 35 U.S.C. § 1400(b) at least because DraftKings Inc., DK Crown Holdings, Crown Gaming, SBTech Global, and SBTech US have committed acts of infringement within this judicial district giving rise to this action and have regular and established places of business in this judicial district, including offices located at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and 1133 Boardwalk, Atlantic City, New Jersey 08401.

29.    Defendants are properly joined under 35 U.S.C. § 299(a) because, as set forth in greater detail herein, Plaintiff's right to relief is asserted herein against Defendants jointly, severally, and in the alternative with respect to or arising out of the same transactions, occurrences, and series of transactions and occurrences relating to the making, using, selling, and offering to sell into the United States the same accused products and services, and questions of fact common to all defendants will arise in the action.  Defendants, through their own acts and each through the acts of each other acting as its representative, alter ego, or agent, of each other, commonly and jointly make, use, sell, and offer for sale the same infringing products and services, including the DraftKings Sportsbook and DraftKings Daily Fantasy Sports offerings through the DraftKings website.

## WINVIEW'S INNOVATIONS RESULTED IN THE ASSERTED PATENTS

30.    Over a period of more than thirty years and through a series of technologically related startup ventures, Mr. David B. Lockton, the inventor of the Asserted Patents, conceptualized and developed a series of successful pioneering technologies, consumer products, services, and companies.  These ventures culminated in Mr. Lockton's latest venture—WinView. WinView's vision was to revolutionize the paid-entry skill game and sports betting industry by introducing new technologies to enable TV viewers to interact in real time with sports programming and deal with the challenges presented by remote, live, and real-time gaming.  By leveraging mobile technology, WinView's innovations enable users to engage with games of skill and chance in dynamic and interactive ways, solving long-standing challenges in sports and entertainment technology.

31.     The success of WinView's vision is illustrated by the decision of the United States Patent and Trademark Office ("USPTO") to award it with a robust patent portfolio with over 90 patents, covering its novel technologies for distributed, mobile, and on-line gaming.

32.     On November 30, 2021, the USPTO duly and legally issued United States Patent No. 11,185,770 (the "'770 Patent") entitled "Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming" to inventors David B. Lockton, Mark K. Berner, Mark J. Micheli, and David Lowe.  WinView is the owner by assignment of the entire right, title, and interest in and to the '770 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '770 Patent is attached to this Complaint as Exhibit 1.

33.     On February 1, 2022, the USPTO duly and legally issued United States Patent No. 11,235,237 (the "237 Patent") entitled "Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming" to inventor David B. Lockton, Mark K. Berner, Mark J. Micheli, and David Lowe.  WinView is the owner by assignment of the entire right, title, and interest in and to the '237 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '237 Patent is attached to this Complaint as Exhibit 2.

34.     On May 24, 2022, the USPTO duly and legally issued United States Patent No. 11,338,189 (the "'189 Patent") entitled "Method of and System for Conducting Multiple Contests of Skill with a Single Performance" to inventor David B. Lockton.  WinView is the owner by assignment of the entire right, title, and interest in and to the '189 Patent, including the right to

seek damages and any remedies for past, current, and future infringement thereof. A true and correct copy of the ’189 Patent is attached to this Complaint as Exhibit 3.

35. On September 20, 2022, the USPTO duly and legally issued United States Patent No. 11,451,883 (the “’883 Patent”) entitled “Method of and System for Managing Client Resources and Assets for Activities on Computing Devices” to inventors David B. Lockton, Tim Huske, Mark J. Micheli, Mark K. Berner, and Matt Ford. WinView is the owner by assignment of the entire right, title, and interest in and to the ’883 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof. A true and correct copy of the ’883 Patent is attached to this Complaint as Exhibit 4.

36. On June 13, 2023, the USPTO duly and legally issued United States Patent No. 11,678,020 (the “’020 Patent”) entitled “Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming” to inventors David B. Lockton, Mark K. Berner, Mark J. Micheli, and David Lowe. WinView is the owner by assignment of the entire right, title, and interest in and to the ’020 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof. A true and correct copy of the ’020 Patent is attached to this Complaint as Exhibit 5.

37. On August 22, 2023, the USPTO duly and legally issued United States Patent No. 11,736,771 (the “’771 Patent”) entitled “Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming” to inventors David B. Lockton, Mark K. Berner, Mark J. Micheli, and David Lowe. WinView is the owner by assignment of the entire right, title, and interest in and to the ’771 Patent, including the right to seek damages and any remedies for past, current, and future

infringement thereof. A true and correct copy of the '771 Patent is attached to this Complaint as Exhibit 6.

38.     On March 5, 2024, the USPTO duly and legally issued United States Patent No. 11,918,880 (the "'880 Patent") entitled "Method of and System for Conducting Multiple Contests of Skill with a Single Performance" to inventor David B. Lockton. WinView is the owner by assignment of the entire right, title, and interest in and to the '880 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof. A true and correct copy of the '880 Patent is attached to this Complaint as Exhibit 7.

39.     On April 9, 2024, the USPTO duly and legally issued United States Patent No. 11,951,402 (the "'402 Patent") entitled "Method of and System for Conducting Multiple Contests of Skill with a Single Performance" to inventors David B. Lockton, Mark K. Berner, and Mark J. Micheli. WinView is the owner by assignment of the entire right, title, and interest in and to the '402 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof. A true and correct copy of the '402 Patent is attached to this Complaint as Exhibit 8.

40.     On June 11, 2024, the USPTO duly and legally issued United States Patent No. 12,005,349 (the "'349 Patent") entitled "Synchronized Gaming and Programming" to inventor David B. Lockton. WinView is the owner by assignment of the entire right, title, and interest in and to the '349 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof. A true and correct copy of the '349 Patent is attached to this Complaint as Exhibit 9.

41.     All of the Asserted Patents are patent eligible, valid and enforceable. The Asserted Patents disclose and specifically claim non-abstract, inventive concepts representing significant

improvements over conventional systems. Specifically, the Asserted Patents introduce transformative advancements in distributed gaming and mobile technology, including real-time bookmaking, geographic integration, specific solutions to manage simultaneous contest participation, and mechanisms to ensure fairness and compliance with state laws. These innovations enable dynamic user engagement, optimize system efficiency, and address complex regulatory requirements.

42.    WinView's inventions solved problems in the art because live television-related interactive gaming systems created memory management inefficiencies in user input processes, an inability to ensure compliance with geographic restrictions and provide entertaining experiences while complying with state gaming and skill-game laws, and an inability to prevent unfair advantages arising from television signal propagation delays. Then-available technologies could not manage assets on mobile devices efficiently, hindering user engagement, fairness, and scalability in gaming environments.

43.    The Asserted Patents cover distinct combinations of inventive concepts, which were not conventional at the time of the inventions, including the following concepts.

44.    **Efficient Management of Assets on a Mobile Device:** The efficient technological management of assets on a mobile device optimizes performance by ensuring that only the necessary assets for specific events are downloaded to users' devices. Previously, users would experience slow loading times and memory shortages when large amounts of unnecessary data were transferred to their devices, which would also slow down the operating speed of the application. This approach solves that problem by determining which assets are already resident on the device and only delivering missing assets in real-time before the event. This reduces data congestion and memory usage, ensuring that users receive the necessary components in a timely

manner without overloading their device's resources. For example, during a live sporting event, the graphics, statistics, and multimedia related to that specific game would be sent to the device, minimizing wait times and optimizing the user experience.

45.    **Providing the Game During an Event Based on Geographic Location:** The Asserted Patents use location-based filtering to provide game options based on users' geographic locations in order to create a personalized gaming experience. Integrating real-time location data with live event information ensures that users are only presented with games and events that are legally available in their area. This enhances the user experience with mobile applications by providing only relevant content and ensures gaming companies can limit operation to the states in which they are licensed by ensuring compliance with state and federal regulations. For instance, a user attending a live sporting event might be prompted by the sports betting provider to join a geographically enabled contest directly related to that event, providing a dynamic, location-specific gaming experience that would not be possible without real-time geographic integration.

46.    **Efficient Application Memory Management Through Limiting Event Information Based on Geographic Location:** The ability to receive and provide event information from gaming servers whose assets exceeds the memory size of a mobile phone provided in real time based on the user's geographic location represents a significant advancement in mobile computer technology. Prior to this innovation, companies offering legalized mobile and online betting would have to provision their applications with all the information required to interact with hundreds of games offering hundreds of constantly changing betting markets for all potential users in a single application. This made it impossible to deliver the real-time information required by a unique bettor, significantly slowing down the applications' performance. In addition, in most cases this approach would exceed a mobile phone's memory capacity. By integrating real-

time location data to filter event information, this invention ensures that users' native applications running on smart phones are only served information for the events legally available in their jurisdiction, reducing memory requirements and enabling necessary speed requirements, while ensuring compliance with applicable state laws. This feature allows for a seamless, immediate, and location-aware user experience, ensuring that the content provided is both fair and legally compliant.

47. **User Input for Group and Event Selections:** The inventions' user-input mechanism for group and event selections represents an efficiency increase in personalized interactive gaming. Previously, users in Daily Fantasy faced a low probability of winning skill-based open tournaments and Daily Fantasy faced the impossibility of allowing less skilled players the enjoyment of a reasonable chance of winning cash, by conducting potentially millions of simultaneous contests at once, each scored separately and simultaneously. The inventions' approach allows users to effortlessly select multiple groups and events at once, with inputs tailored to their personal preferences and experience level. This approach enables contest providers to operate a massive real-time computing system at very low cost, in effect making it possible to operate Daily Fantasy Sports based on common live events.

48. **Receiving Group Selections by a Device/Server Where Each Group Simultaneously Participates in a Separate Competition**: The simultaneous nature of participation ensures that personalized user selections are registered and managed efficiently, leveraging device/server-side processing for better contest management. This approach allows users to compete with their selection in multiple contests simultaneously with the same performance and with the same investment of time. The offering of many different types of contests simultaneously obviates the problem of single open contests of skill consistently won by

a handful of extremely skilled professional competitors.  The user experience can further be enhanced by simultaneously scoring user performance.

49.    **Receiving/Triggering a Lockout Signal:** Receiving or triggering a lockout signal ensures the integrity of all gaming based on real-time sporting events by preventing last-minute changes to user inputs that could provide some users with significant competitive advantages, undermining the fairness of competition.  In live betting systems, after an event is underway, latency between an event's occurrence and its broadcast to users could allow some players, such as those attending an event live or observing the event through a television source with lower signal propagation latencies, to gain an unfair advantage by observing the unfolding action earlier. A lockout signal effectively freezes user inputs as soon as the event's relevant actions begin.  On the other hand, sports betting companies wish to delay locking out a potential bet unnecessarily early in order to increase their revenues by accepting more wagers.  Different sports and game occurrences present a wide variety of the optimal timing of a lockout signal.  By adjusting the execution of a lockout signal for the anticipated time until resolution, taking into account the measured difference between the earliest arriving TV signal and a later arriving one, and utilizing a person physically present at a live event to mark the latest time a lockout must be executed by marking the lockout event in real time, this innovation further optimizes the length of the betting window for the book maker.  At the same time the method minimizing the impact of latency and ensures an even playing field for all participants.  Confidence that no users will have an unfair advantage is critical to providing a fair and attractive remote-gaming experience and in many cases compliance with various laws.

50.    **Determining a Plurality of Competitive Groups Based on Eligibility:** Determining a plurality of competitive groups based on user eligibility represents an advancement

in ensuring fairness across multiple contests, allowing competitors to avoid having to compete against much more skilled competition. This process analyzes a range of real-time data—such as users' skill level, geographic location, and eligibility to participate in specific types of contents in order to ensure that users are presented or placed into appropriate competitive groups. By matching users to contests based on these criteria, the system levels the playing field and enhances user engagement by personalizing their gaming experiences.

51.    **Equalizing Latencies in Presenting In-Game Data During a Live Event:** The ability to equalize effects of latency issues in synchronization of the game data presented, with a live event, increases the enjoyment and fairness of games for users. In sports betting, for example, fair competition necessitates that a fast-paced game, based on the unfolding television action, has a level playing field for all participants regardless of how they receive their game feed. Live sports betting, which relies on participation by watching an event on a television, has potential latency issues since, for example, television signal reception is not uniform and there are delays between individuals attending a game and varied amounts of delay for those watching the game live on television. The online broadcast of content depicting what is happening in the sporting event with the synchronized game data constituting, for example, updated odds and propositions, allows games of chance that rely on participation by watching an event and related data displayed simultaneously. Equalizing delays prevents those attending in person or with access to a lower-latency feed from having a competitive advantage.

52.    By disclosing and claiming these and other specific inventive concepts, the Asserted Patents go far beyond just a simple combination of generic components to perform conventional activities. As explained above, the claimed inventions provide technological solutions to address the shortcomings in technology at the time and improve the functionality and

capabilities of computers for managing distributed gaming.  These inventive concepts provide tangible solutions that address unique challenges in distributed gaming systems, ensuring fairness, compliance, and efficiency.

53.    These inventive concepts were not known in the art, let alone conventional, at the time of the inventions because no existing systems provided mechanisms to dynamically filter event participation based on location, prevent latency-based advantages with real-time lockout signals, or optimize mobile asset management in distributed gaming.  These features represent groundbreaking advancements that were unavailable in prior art, demonstrating the inventive concepts of the patented claims.

54.    In addition, the claims of the Asserted Patents are rooted in computer technology as they are specifically directed toward solving challenges in distributed gaming and mobile device technology, such as contest management, event compliance, and system efficiency.  By leveraging specific implementations, real-time geographic data, server-side processing, and dynamic user input mechanisms, the inventions address domain-specific problems inherent to on-line gaming systems and mobile devices.

55.    The significance of WinView's patents is illustrated by the fact that they have been cited by subsequently filed patents as relevant art over 253 times.  Together, the features of the Asserted Patents provide transformative solutions to long-standing challenges in distributed and interactive gaming.

56.    WinView has not licensed any of the Asserted Patents to any third party.  WinView has not offered for sale, sold, or licensed any products that embody any claim of the '189, '020 or '349 Patents.  In addition, all claims in the '770 and '237 Patents are limited to method claims. With respect to the '883, 880, and 402 Patents, WinView is only asserting method claims in this

action and, therefore, has removed any requirement for marking as to the '883, '880, and '402 Patents.  Moreover, DraftKings has had actual notice and knowledge of the Asserted Patents, as set forth below.  Thus, WinView's recovery of pre-suit damages for DraftKings' infringement of the Asserted Patents is not limited by 35 U.S.C. § 287(a) as to any Asserted Patent.

## DRAFTKINGS' INFRINGING PRODUCTS

57.    DraftKings' main product offerings to consumers include online sports betting through the DraftKings Sportsbook and Casino, online casino gaming through the DraftKings Casino, online traditional salary-based fantasy sports through DraftKings Fantasy Sports ("Daily Fantasy"), and online prop-based predictions fantasy sports through DraftKings Pick6: Fantasy Game ("Pick6").  DraftKings makes, uses, sells, and offers for sale infringing products, including DraftKings Sportsbook and Casino, DraftKings Casino, DK Horse, iGaming, Daily Fantasy, and Pick6, which practice the claims of the Asserted Patents (the "Accused Products").  The Accused Products are services provided and managed by DraftKings for use by players on DraftKings' website and mobile applications.

58.    SBTech, now a subsidiary of DraftKings, Inc., provided the technology operating the Accused Products.  As shown in the figure below, SBTech and other DraftKings entities power the DraftKings' branded Online Sports Betting (OSB) and casino iGaming platforms.



Ex. 21 at 17 (2020 investor presentation).

59.     Prior to the formation of the current DraftKings, Inc. entity in 2018, DraftKings' sole product offering was Daily Fantasy.  DraftKings then began offering Sportsbook and iGaming products.  States including New Jersey have allowed these games of chance product offerings, which have accounted for a rapidly growing proportion of DraftKings' users and revenue growth. *See, e.g.*, Ex. 15 (DraftKings News Release) ("Since becoming the first mobile operator to launch in New Jersey in August 2018, DraftKings has consistently maintained greater than 30% online market share, and for the nine months ended September 30, 2019, the company recorded 8.5x year-over-year revenue growth in the state.").

60.     DraftKings has a large presence in the United States.  While DraftKings launched its first mobile sportsbook in New Jersey, DraftKings has expanded its geographic footprint and

currently offers its mobile and retail sportsbooks in twenty-five states, including Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi (retail only), New Hampshire, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Vermont, Virginia, Washington (retail only), West Virginia, and Wyoming and also in Washington DC.    Ex. 22 (https://sportsbook.draftkings.com/help/sports-betting/where-is-sports-betting-legal).    The DraftKings Daily Fantasy Sports offering is available in most states.    Ex. 23 (https://www.draftkings.com/where-is-draftkings-legal).    The DraftKings iGaming product offering is available in Connecticut, Delaware, Michigan, New Jersey, Pennsylvania, Rhode Island, and West Virginia.  Ex. 24 (https://casino.draftkings.com/where-is-online-gambling-legal). DraftKings also has arrangements in place with land-based casinos to expand operations into additional states upon the passing of relevant legislation, the issuance of related regulations, and the receipt of required licenses.  Ex. 13 (DraftKings' 10-K) at 7.

61.    While DraftKings has physical locations via its partnerships, most of its consumers use the Accused Products via its online platforms.  DraftKings offers the Accused Products on Apple iOS and iPadOS via Apple's App Store and on Android via Google's Play Store.  For example, as shown below, DraftKings' Sportsbook mobile application is available on iOS.  In addition to its mobile app offerings, DraftKings' offers the Accused Products via traditional and mobile websites.  Ex. 13 (DraftKings 10-K) at 7.



(screenshot of DraftKings' Daily Fantasy app in Apple's App Store).

(screenshot of DraftKings' Pick6 App in Apple's App Store).





(screenshot of DraftKings Casino app in Apple's App Store).

(screenshot of DraftKings Sportsbook & Casino app in Apple's App Store).



(screenshot of DK Horse app in Apple's App Store).

62.    In addition to its mobile app offerings, DraftKings' offers the Accused Products via traditional and mobile websites.  Ex. 13 (DraftKings 10-K) at 7.



(screenshot of the DraftKings' Sportsbook website).



(screenshot of the DraftKings' Casino website).



(screenshot of DraftKings' Daily Fantasy website).



(screenshot of DraftKings' Pick6 website).



(screenshot of DK Horse website).

63.    DraftKings' Sportsbook service is also offered at DraftKings' brick-and-mortar partner casinos via on-site DraftKings kiosks, which allow users to the access the DraftKings Sportsbook service.  Ex. 25 (DraftKings Casino Partners).



(photograph of a DraftKings kiosk).

64.    DraftKings operates servers within each state from which it offers the Accused Products, as it is generally required to by state laws and regulations. *See, e.g.*, N.Y. PML § 1367-A(h)-(i) ("The server or other equipment which is used by a mobile sports wagering licensee to accept mobile sports wagering shall be physically located in the licensed gaming facility"); N.J.S.A §§ 5:12A-11(a); 5:20-2(c) ("all equipment used by the holder of the permit, including computers and servers, to conduct fantasy sports activities shall be physically located within the boundaries of" "a restricted area on the premises of the casino hotel or in another facility owned or leased by the casino licensee . . . that is secure, inaccessible to the public"); N.J.S.A § 5:12-95.22; 68 IAC 27-6-2 ("A sports wagering operator must locate a server in the state of Indiana.").

DraftKings' servers communicate with customers' devices operating the Accused Products, such as mobile phone, tablets, and laptops.

65.     In order to ensure compliance with applicable state laws and provide users with correct permissions information, the Accused Products use GeoComply to monitor the location of the devices using the Accused Products.  Ex. 26 (How do I turn on locations services for an iOS mobile devices) (regarding geolocation monitoring on mobile devices); Ex. 27 (Using DraftKings with GeoComply Location Services) (regarding geolocation monitoring on desktops and laptops). GeoComply is available on mobile phones, tablets, and laptop computers and "occurs seamlessly in the background during the customer's session, without any intrusion to the overall user flow/experience."  Ex. 28 (GeoComply Overview).

66.     If customers attempt to use the Accused Products when they are located in a jurisdiction where the service is not permitted, DraftKings prevents the users from placing bets on the relevant Accused Product's app or website and informs the users that they appear to be located in a state where the DraftKings service is not available.  DraftKings also provides this notification when customers using DraftKings leave a jurisdiction where their gaming service is permitted and enter jurisdiction where it is not.  DraftKings does so by continuously monitoring customers' locations while they are gaming.



(screenshot of the DraftKings' Sportsbook app).

**A.** **DraftKings Sportsbook**

67.     In May 2018, the Supreme Court struck down as unconstitutional the Professional and Amateur Sports Protection Act of 1992. This decision lifted federal restrictions on sports betting and allowed states to individually determine the legality of sports betting. Since this decision, thirty-five states have legalized some form of sports betting and sports betting is on the rise.

68.     DraftKings' Sportsbook and Casino engages consumers in their sports viewing experience. Sports betting involves users placing bets by wagering money at some fixed odds.

The matter on which the users bet is often referred to as a "proposition" or "prop bet."  If the users win, DraftKings pays out the bet.  DraftKings generates revenue from the difference between the payouts to winning bettors and the total amount of money wagered by all bettors.  Ex. 13 (DraftKings 10-K) at F-14.  In the long run, the greater the volume of wagers placed, the more revenue DraftKings will generate.

69.    DraftKings offers a wide variety of propositions on particular sporting events throughout the year.  For example, DraftKings offers propositions on NFL football, NBA basketball, and MLB baseball games.

70.    DraftKings Sportsbook and Casino offers betting propositions that include traditional bets based on end-of-game outcomes, such as who will win a particular game or whether a team will win by more than a certain number of points.  DraftKings Sportsbook and Casino also offers "Live In-Game" betting propositions that are made during games and as the action unfolds. Live In-Game betting is a significant feature of the DraftKings Sportsbook, designed to increase user engagement, enhance the sports betting experience, and ultimately generate more revenue for DraftKings.



Ex. 29 (How to Bet) (describing in-game betting functionality).

71.     DraftKings offers live in-game betting propositions for various sports, such as MLB baseball, NBA basketball, tennis, table tennis, and NFL football.  For example, DraftKings offers "Pitch-by-Pitch" or "Result of Pitch" betting propositions during MLB baseball games.  In these propositions, DraftKings provides odds on micro-betting opportunities, such as whether a particular pitch will be a strike/foul, a ball/hit-by-pitch, or in-play.

72.     As the action unfolds relating to a particular live in-game betting proposition, the DraftKings Sportsbook and Casino website and app provide users with updated odds for betting propositions.  For example, on a proposition offered before the kickoff of the Super Bowl, DraftKings might offer a proposition that the Ravens will outscore the Chiefs opponent during the first quarter.  While that same proposition will continue to be presented until the end of the first

quarter, if the Chiefs kick a field goal, the wager presented will be closed and made unavailable for a few seconds and then reoffered with different odds reflecting the change in the game state, thus offering the same proposition with changing odds through the quarter.

73.     The DraftKings Sportsbook and Casino also prevents betting propositions when users are no longer permitted to place a particular wager.  For example, DraftKings does not allow users to place wagers on outcomes that are already known (such as after the event in question has occurred).  Otherwise, users could easily cheat by betting after they know the result.  When users are no longer permitted to wager on particular outcomes, the displayed choices for those particular wagers are grayed out or removed from the user interface and the user is prevented from submitting a selection.  DraftKings sends lockout signals to prevent bets at an appropriate time to level the playing field, increase user engagement, and prevent participants from obtaining information that could give them a material advantage in their betting on the proposition, including for example locking out bets at an appropriate time based on an amount of delay that users may experience depending on the manner in which they receive broadcast content over various transmission methods.

74.     To further enhance customers' experiences, DraftKings provides live content streams to select games based on customers' geographic location.  DraftKings also uses geographic information to determine if customers can watch live streams of specific games.  Customers within states that allows sports betting are allowed to stream the games.

### B.     **DK Horse**

75.     DraftKings markets, advertises, sells, and offers to sell DK Horse, including through draftkings.com, dkhorse.com, Apple's App Store, and Google's Play Store. Below is a screenshot of DK Horse app on Apple's App Store:



(screenshot of DK Horse app on Apple's App Store).

76.    In addition to its Daily Fantasy and Sportsbook offers, DraftKings expanded into the online horse racing market. While DK Horse offers betting on horse races and the DraftKings Sportsbook and Casino offers betting on other sporting events, for purposes of infringement, the relevant functionality in DK Horse and DraftKings Sportsbook and Casino is the same.

77.    DK Horse is an iGaming service that is available for use in California, Colorado, Florida, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Minnesota, Montana, New York, Ohio, Oregon, Pennsylvania, Virginia, Washington, West Virginia and Wyoming. *See* Ex. 30 (Where is DK Horse legal). Below is a screenshot showing that DK Horse

will block customers from placing bets on races if they are not located within a jurisdiction where the service is legal:



(screenshot of DK Horse App requiring the user's precise location).

78.     DK Horse allows users to bet on horseracing and live stream the races. DK Horse covers a wide variety of horse racing events, including, but not limited to, the Kentucky Derby, Preakness Stakes, and Belmont Stakes. Below is a screenshot of an example of races available to a user for betting:



(screenshot of races available for betting on DK Horse app).

79.    DK Horse offers various types of wagers to be placed, including win, place, show, any combination of these three wagers, exacta, trifecta, superfecta, double, pick-3, and pick-5. Below is a screenshot of an example of the bets available for a race on DK Horse:



(screenshot of bets available on DK Horse App).

80.    Below is a screenshot of DK Horse website:



(screenshot of DK Horse website).

### C.    **DraftKings Casino**

81.    DraftKings markets, advertises, sells, and offers to sell DraftKings Casino, including through draftkings.com, casino.draftkings.com, Apple's App Store and Google's Play Store.

82.    In addition to its Daily Fantasy and Sportsbook offerings, DraftKings expanded into the online casino market, providing a diverse range of gaming options. DraftKings Casino is an iGaming service that is available for use in Connecticut, Delaware, Michigan, New Jersey, Pennsylvania, Rhode Island and West Virginia. *See* Ex. 24 (Where is online gambling legal).

83.    DraftKings Casino' offerings include a full suite of games available in brick-and-mortar casinos, such as blackjack, roulette, baccarat, and slot machines. Most of the games are based on streamed computer simulations and others offered with live dealers. For these games, DraftKings Casino functions similar to brick-and-mortar casinos, generating revenue through gross winnings, as users play against the house. DraftKings Casino's games include a combination of games that DraftKings built in-house and games that it licensed content from suppliers. Ex. 13 (DraftKings 10-K).



(screenshot of DraftKings' Casino website showing various available games).

84.    DraftKings Casino can be accessed by end users on (1) the DraftKings Casino mobile application and (2) the DraftKings Casino's desktop and mobile sites.  These allow players to play their favorite casino games from home, work, or on the go.  The DraftKings Casino mobile applications are available on iOS, iPad, and Android devices.  The web-based interface is available through a web browser running on a personal computer, laptop, or other computing device.

85.    DraftKings markets, advertises, sells, and offers to sell the DraftKings Casino product, services, and mobile applications through its root website domain draftkings.com, which includes the subdomains such as casino.draftkings.com.  The website and mobile applications prominently use the names "DraftKings," and "DraftKings Casino" throughout.





(screenshot of the DraftKings Casino app in the Apple App Store).

(screenshot of the DraftKings Casino App).



(screenshot of the DraftKings Casino website).

41

86.    DraftKings markets, advertises, sells, and offers to sell the DraftKings Casino product, services, and mobile applications through its root website domain draftkings.com, which includes subdomains such as casino.draftkings.com.   The website and mobile applications prominently use the names "DraftKings," and "DraftKings Casino" throughout.

D.    **DraftKings Daily Fantasy**

87.    DraftKings' first consumer offering was Daily Fantasy.  DraftKings Daily Fantasy can be accessed via mobile apps downloaded on users' smartphones, tablets or computers. DraftKings offers Daily Fantasy on its website and on the DraftKings Daily Fantasy application for mobile devices.   DraftKings offers a DraftKings Daily Fantasy app for download and installation through the Apple App Store and Google Play Store.  DraftKings provides download links for these apps on its website.

88.    DraftKings Daily Fantasy allows users to create fantasy sports lineups for various professional leagues and compete in daily or weekly contests, instead of full-season fantasy leagues.   DraftKings covers ten different ranges of sports for its daily fantasy sports (DFS) contests.  Each of these sports has contests where users select lineups to compete based on athletes' real-world performance.

89.    DraftKings offers various types of contests to suit different preferences and skill levels:

- Head-to-Head: Two players face off and the winner takes all.

- 50/50s: The top half of participants win money, while the bottom half get nothing.

- Tournaments (Guaranteed Prize Pools or GPPs): Larger contests with many participants. A fixed prize pool is guaranteed, regardless of how many people enter.  These contests usually have top-heavy payouts, meaning only the top few finishers win large prizes.

- <u>Multipliers</u>: These contests offer a set payout structure where players can win 2x, 3x, or more of their entry fee if they finish high enough.

- <u>Leagues</u>: Custom contests where users can invite their friends or other players to compete for specific stakes.

90.    Below is a screenshot of the DraftKings Fantasy Sports mobile application.



(screenshot of DraftKings Fantasy Sports App on Apple App Store).

91.    Below is a screenshot of DraftKings' Daily Fantasy website.



(screenshot of DraftKings Daily Fantasy website).

92.     DraftKings' Daily Fantasy Sports allows users to enter contests.  For example, in its "How to Play" site, DraftKings explains that to Pick a Daily Fantasy Contest a user "[b]rowse[s] the lobby to choose from a wide range of contests across all different sports.  A contest is the specific competition you and your lineup will be competing in against other players for prizes." Ex. 31 at 1 ([How to Play](#)).  Each contest has multiple competitors.  For example, in the screenshot below, a user can view the competitors for a selected contest.



(screenshot of DraftKings Daily Fantasy App showing competitors for a selected contest).

93.     DraftKings provides Daily Fantasy Sports contests users may enter for various sports (including, NFL football, NBA basketball, and MLB baseball, among others), scores the contests, and distributes prizes.  Users can draft a new lineup whenever they want, play in a public contest and against friends in a private league, quickly enter a contest any time before the lineup lock, and win cash prizes daily and weekly that are paid out after the contest ends.  Below are screenshots of the DraftKings Daily Fantasy mobile application (in the example, on an Apple device):





(screenshot of DraftKings Daily Fantasy
App showing examples of available sports
contests).

(screenshot of DraftKings Daily Fantasy
App showing a user can build a lineup).

94.     To increase user participation and corresponding Daily Fantasy Sports revenue,

DraftKings recommends that users join multiple contests and provides functionality for users to

enter their lineups quickly in multiple contests.  For example, DraftKings recommends contests

and instructs users to use their lineup to quickly join those contests.

46



(screenshot of the DraftKings Daily Fantasy app showing that DraftKings recommends additional contests to join with the same lineup).

95.    To encourage its customers to use the multiple-lineup functionality and increase revenue, DraftKings offers incentives to customers to enter multiple lineups.



Ex. 32 (DraftKings DFS Multi-Lineup Mania) (screenshot of DraftKings' website).

96.    DraftKings also provides a "Bulk Enter" feature that allows customers to enter their selected lineup into multiple, simultaneous contests.  In particular, this feature is intended to eliminate "[m]anually entering [e.g.,] 150 lineups into a contest one by one [which] is time consuming and prone to errors."  Ex. 33 at 1 (How do I upload or edit multiple lineups are once).



Ex. 34 at 3 (How Do I Enter a Fantasy Sports Contest) (https://help.draftkings.com/hc/en-us/articles/4405229766163-How-do-I-enter-a-Fantasy-Sports-contest-US).

**E.    DraftKings Pick 6**

97.    DraftKings Pick6: Fantasy Game ("DK Pick6" or "Pick6") is an online gaming platform that allows users to participate in peer-to-peer fantasy sports games where participants

create a lineup of 2 to 6 athletes from a single sport and predict whether each athlete will outperform their statistical projections. DK Pick6 covers major sports such as the NFL and NBA. Players compete against each other by entering their "Pick Sets" into contests, and winners are determined based on the accuracy of their predictions. Correct picks earn players a share of the cash prizes available in the contests.

98.     DK Pick6 can be accessed via the DraftKings mobile application, which is available on iOS, iPad, and Android devices, including iPhones, iPads, Android phones, and tablets. Additionally, the feature is accessible through the DraftKings web application, allowing users to make their predictions from a personal computer, laptop, or other computing devices. This accessibility ensures that players can engage with DK Pick6 at home, work, or on the go.



(screenshot of DraftKings Pick6 App on Apple App Store).

99.    DraftKings markets, advertises, sells, and offers DK Pick6 through its root website draftkings.com and subdomains, including pick6.draftkings.com.  DraftKings' website and mobile applications prominently use the names "DraftKings" and "DraftKings Pick6" throughout, ensuring consistent branding and recognition across all platforms.  This strategic integration within the DraftKings ecosystem broadens the appeal of the platform and also enhances user engagement through diversified interactive experiences.   Below is a screenshot of DraftKings' Pick 6 website.



(screenshot of DraftKings' Pick6 website).   A screenshot of the DraftKings Pick6 mobile application (in the example, on an Apple device) is shown in the following screenshot:



(screenshot of DraftKings' Pick6 App).

### F.    **DraftKings' Marketing and Customer Support**

100.    DraftKings actively markets its Accused Products through multiple channels, including social media advertising, sponsored content, in-casino advertisements, partnerships with major sports leagues, celebrity endorsements, billboards, in-app promotions, DraftKings' websites, and traditional media advertising.

 

(photograph of a DraftKings Sportsbook billboard).

(screenshot of the DraftKings Daily Fantasy in-app promotions).



(screenshot of a DraftKings Casino informercial promotion) (available at https://www.youtube.com/watch?v=lzekX1HRkF4).

101.    DraftKings also has strategic partnerships with several major sports leagues, including the National Football League (NFL), National Hockey League, (NHL), National Basketball Association (NBA), Women's National Basketball Association (WNBA), Professional Golf Association (PGA), Ultimate Fighting Championship (UFC), Professional Fighters League (PFL), and American Cornhole League (ACL).    Some of these partnerships are exclusive partnerships, including its partnerships with the MLB, New England Patriots, and Barstool Sports. These sponsorships enable, for example with respect to MLB, exclusive content throughout the regular season and postseason games, product integrations on MLB platforms, and the rights to utilize the MLB marks and logos within promotional marketing.

102.    DraftKings' marketing and partnerships aim to recruit new customers, reengage former customers, and retain current customers via different marketing strategies.    Ex. 13 at 60-61 (DraftKings 10-K) ("We grow our business by attracting new paid users to our product offerings and increasing their level of engagement with our product offerings over time.    To effectively attract and retain paid users and to re-engage former paid users, we invest in a variety of marketing channels in combination with personalized customer promotions, most of which can be used across all of our product offerings (such as free contest entries or bets or matching deposits).    These investments and marketing efforts are intended to increase consumer awareness and drive engagement.").







(screenshot of a DraftKings Casino promotion offer credits to new customers).

(screenshot of a DraftKings Pick6 promotion featuring Lebron James, a popular basketball player).

103.    The Accused Products are all integrated, allowing customers to use the same user accounts and cash deposits across the Accused Products and to seamlessly switch between them. *See* Ex. 13 (DraftKings 10-K) at 6.  For example, if a DraftKings Casino user wins $1,000 and wants to use those earnings to place sports bets, the user can switch to DraftKings Casino and place bets with the $1,000 won in DraftKings Casino.

104.    DraftKings encourages customers at their partner locations to engage with the Accused Products and secure them as new users of the Accused Products.  Collectively, these

strategies increase DraftKings' ability to cross-sell the Accused Products, which extracts the maximum potential revenue from a customer.  Ex. 13 at 3 (DraftKings 10-K) ("We also make significant investments in sales and marketing and incentives to grow and retain our paid user base, including personalized cross-product offers and promotions, and promote brand awareness to attract the 'skin-in-the-game' sports fan. . . . When we launch our Sportsbook and iGaming product offerings in a new jurisdiction, we invest heavily in user acquisition, retention and cross-selling until the new jurisdiction provides a critical mass of users engaged across our product offerings."); *see also* Ex. 21 (2020 investor presentation) (describing DraftKings' promotional efforts to increase usage of the Accused Products).



Ex. 21 at 12.  This cross-selling can be done with, for example, advertising across different products.  In the screenshot below, DraftKings is advertising for its Pick6 service on its DraftKings Casino.



(screenshot of the DraftKings Casino website showing promotions to encourage customers to use the Pick6 product).

105.    In addition to its marketing strategies and promotions, DraftKings encourages customers to actively engage with its platform by providing comprehensive resources through its Help Center, an FAQ site designed to assist users.  The Help Center offers detailed guides on how to play various games and understand the underlying concepts.  For example, it includes sections like *Sports Betting Explained*, *How to Play Daily Fantasy Sports*, *How to Play Casino Games*, and a *Glossary of Fantasy Sports Terms*.  Ex. 35 (Sports Betting Explained), Ex. 31 (How to Play Daily Fantasy Sports); Ex. 36 (How to Play Casino Games), Ex. 37 (Glossary of Fantasy Sports Terms).  All of these sections are intended to encourage and increase customers' infringing use of the Accused Products and, thereby, increase DraftKings' revenue.

106.    As another example, DraftKings offers step-by-step guides and videos on how to play its casino games, including blackjack, slots, roulette, craps, and baccarat.  *See, e.g.*, Ex. 38 (How to Play Blackjack).  These guides also include strategies on the best way to play and bet. Ex. 39 (Blackjack Strategies: Simple Strategies to Improve Your Game).  These guides and videos

are intended to encourage and increase customers' infringing use of DraftKings' infringing casino products and, thereby, increase DraftKings' revenues.

107.    Additionally, DraftKings offers practical instructions on its website for navigating its platform, such as *How to place a bet on DraftKings*, *How to enter a Fantasy Sports contest*, and *How to make Picks*.  DraftKings provides instructions on how to use the actual Accused Product platforms along with how DraftKings' contests work.  *See, e.g.,* Ex. 40 (How do I place a bet on DraftKings); Ex. 34 (How do I enter a Fantasy Sports contest?); Ex. 41 (How do I make Picks?); Ex. 42 (How it Works – Contest Distribution and Prizing).  These instructions are intended to encourage and increase customers' infringing use of the Accused Products and, thereby, increase DraftKings' revenue.

### G.    DraftKings' Use of AWS Services

108.    In addition to its own servers, DraftKings uses cloud-hosted services to support the operation of the Accused Products and to increase its customers' usage of the Accused Products and, thereby, increase DraftKings' revenues.  Ex. 43 (Migrate hundreds of microservices to the cloud with zero downtime — Part 1) ("At DraftKings, the decision to modify the topology, where some parts of the system reside On-Prem [referring to servers operated by DraftKings] and others in the Cloud, was a strategic choice aimed at leveraging the best of both environments while also considering factors such as regulatory requirements.").  Specifically, DraftKings uses Amazon Web Services' (AWS) Lambda product to operate its Accused Products and improve the customers' experience with the Accused Products.  *See* Ex. 44 (Making Strides Towards Serverless).  Reviewing the network traffic of an Accused Product illustrates DraftKings' use of other AWS products that integrate with Lambda, including S3 (object storage system) and

CloudFront (content delivery network) services.  *See* Ex. 47 (DraftKings' technology profile illustrating it uses AWS services such as CloudFront S3) (https://builtwith.com/draftkings.com).



| ▼ General | |
|---|---|
| Request URL: | https://www.draftkin |
| Request Method: | GET |
| Status Code: | 🟢 200 OK |
| Remote Address: | [2600:1406:3a00:a: |
| Referrer Policy: | strict-origin-when-c |
| ▼ Response Headers | |
| Accept-Ranges: | bytes |
| Access-Control-Allow-Credentials: | true |
| Access-Control-Allow-Origin: | * |
| Access-Control-Expose-Headers: | Date,ETag,calculatio |
| Cache-Control: | public, max-age=43 |
| Content-Length: | 51708 |
| Content-Type: | application/octet-str |
| Date: | Fri, 25 Oct 2024 05: |
| Etag: | "515a8af481f298b6 |
| Last-Modified: | Tue, 08 Oct 2024 17 |
| Strict-Transport-Security: | max-age=2628000 ; |
| X-Amz-Id-2: | 3f13S+8Il0+wvLE8S |
| X-Amz-Request-Id: | E6MPAQ79M3SXH9 |
| X-Amz-Server-Side-Encryption: | AES256 |
| X-Content-Type-Options: | nosniff |
| X-Frame-Options: | SAMEORIGIN |

| ▼ General | |
|---|---|
| Request URL: | https://d2tjpz01y5bfgl |
| Request Method: | GET |
| Status Code: | 🟢 200 OK (from disk |
| Remote Address: | 52.222.231.20:443 |
| Referrer Policy: | strict-origin-when-cro |
| ▼ Response Headers | |
| Accept-Ranges: | bytes |
| Age: | 44916 |
| Content-Length: | 7691 |
| Content-Type: | image/png |
| Date: | Thu, 24 Oct 2024 16: |
| Etag: | "b06aa4c1d2fc7815c( |
| Last-Modified: | Mon, 14 May 2018 15: |
| Server: | AmazonS3 |
| Via: | 1.1 6ecf574c848f26ft |
| X-Amz-Cf-Id: | k32I9FMf50uqqiVifpe |
| X-Amz-Cf-Pop: | SFO5-C3 |
| X-Cache: | Hit from cloudfront |

(screenshot of DraftKings' network traffic with X-Amz-Id-2 in the response header, indicating use of AWS servers); *see also* Ex. 45 (listing X-Amz-Id-2 as an AWS response header).

(screenshot of DraftKings' network traffic with X-Amz-Cf-Id in the response header, indicating use of AWS servers); *see also* Ex. 46 (listing X-Amz-Cf-Id as an AWS response header).

109.    DraftKings' SEC filings further confirm that DraftKings uses AWS services to provide the Accused Products. Ex. 13 at 19 (DraftKings 10-K) ("[DraftKings] rel[ies] on Amazon Web Services to deliver [its] product offerings to users," and "[it] host[s] certain of [its] product offerings and support [its] operations using Amazon Web Services ("AWS"), a third-party provider of cloud infrastructure services, along with other service providers.").

110.    DraftKings has direction and control over AWS' servers via its services.  AWS' Customer Agreement and Data Privacy Terms demonstrate that DraftKings configures, directs, and controls AWS' services like S3 and CloudFront that DraftKings is operating.  By configuring,

monitoring, and orchestrating such services, DraftKings dictates how these services operate to support DraftKings' Accused Products.

111.    AWS' Customer Agreement provides that customers, including DraftKings, are responsible for and control their use of AWS' servers:

- "[DraftKings is] responsible for [its] Content. [DraftKings] will ensure that [its] Content and [its] and End Users' use of [its] Content or the Services will not violate any of the Policies or any applicable law."

- "[DraftKings is] responsible for properly configuring and using the Services and otherwise taking appropriate action to secure, protect and backup your accounts and [its] Content in a manner that will provide appropriate security and protection, which might include use of encryption to protect [its] Content from unauthorized access and routinely archiving [its] Content."

- "[DraftKings] will be deemed to have taken any action that [it] permit, assist or facilitate any person or entity to take related to this Agreement, [its] Content or use of the Services. [DraftKings is] responsible for End Users' use of [its] Content and the Services, and for their compliance with [its] obligations under this Agreement."

- "[Amazon] do[es] not provide any support or services to End Users unless [DraftKings and Amazon] have a separate agreement with [DraftKings] or an End User obligating [Amazon] to provide such support or services."

Ex. 48 (AWS Customer Agreement).

112.    Additionally, AWS' data privacy terms specify that "[DraftKings] maintain[s] full control of [its] content that [it] uploads to the AWS services . . . , and [is] responsib[le] for configuring access to AWS services and resources. . . . [DraftKings] configure[s] access control permissions for any of the services [it] develop[s] or deploy[s] in an AWS environment. [AWS]

do not access or use [DraftKings'] content for any purpose without [its] agreement.  Ex. 49 (Data Privacy FAQs).

## **DRAFTKINGS' INFRINGEMENT OF WINVIEW'S PATENTS**

113.    DraftKings has infringed and continues to infringe one or more claims of each of the Asserted Patents by engaging in acts that constitute infringement under 35 U.S.C. § 271, including making, using, selling, and offering for sale, within this District and elsewhere in the United States, without authority or license, DraftKings products and services falling within the scope of one or more claims of the Asserted Patents.

114.    In addition to directly infringing the Asserted Patents pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, DraftKings indirectly infringes the Asserted Patents under 35 U.S.C. §§ 271(b) and (c), literally or under the doctrine of equivalents.

115.    As discussed above, DraftKings induces infringement of the Asserted Patents by instructing, directing and requiring others, including its customers, purchasers, users, and developers, to meet claim elements of the Asserted Patents, literally or under the doctrine of equivalents.

116.    DraftKings contributorily infringes the Asserted Patents by making and supplying products that are components in an infringing system with components from manufacturers, customers, purchasers, users, and developers that together meet all claim elements in the Asserted Patents, literally or under the doctrine of equivalents.

## **DRAFTKINGS' KNOWLEDGE OF WINVIEW'S ASSERTED PATENTS**

117.    As set forth below, DraftKings had pre-suit knowledge of the Asserted Patents and that its Accused Products infringe the Asserted Patents.  At the very least, DraftKings is aware of

the Asserted Patents and of its Accused Products' infringement of the Asserted Patents from its receipt of this Complaint.

118.    WinView Inc. widely disclosed the Asserted Patents giving notice of the Asserted Patents to DraftKings and other participants in the online gaming industry.  At least as early as December 2015, WinView Inc., the previous holder of the Asserted Patents, identified its patents on the intellectual property page of its website.  Ex. 50 (Archive.org screenshot).  WinView Inc. regularly updated this website, disclosing the Asserted Patents as they issued.

119.    WinView Inc. issued publicly available statements and press releases, including on its website, disclosing its patents and stating that, among other things, its "portfolio of [] foundational patents covers the synchronization of the second-screen with TV broadcasts and commercials and the optimum methods of monetizing sports-based games of skill, among other types of programming content."  Ex. 52 at 4 (Press release).

120.    DraftKings was well aware of WinView Inc. and of its technology and patents, long before WinView filed this case.  WinView Inc. sought to partner with a major gaming company. In January 2019, David Lockton, WinView's Founder, President, and CEO, contacted (through a consultant) Jason Robbins, Chief Executive Officer and Co-founder of DraftKings, about a potential relationship between WinView Inc. and DraftKings.  Mr. Lockton wanted to update Mr. Robbins on WinView Inc.'s patented technology and to propose that WinView Inc. and DraftKings partner together to exploit that technology.  Mr. Lockton requested an in-person meeting in New York or Boston.

121.    Mr. Robbins responded on January 3, 2019, and invited Mr. Lockton and Tom Rogers, the Executive Chair of WinView Inc., to meet with him in Boston.

122.    In early 2019, WinView Inc. and DraftKings engaged in further communications. WinView Inc. and DraftKings discussed WinView Inc.'s foundational intellectual property for wagering along with live sports, including games of skill and sports gambling in the United States. Mr. Lockton provided DraftKings with background information and forwarded to DraftKings a PowerPoint presentation mentioning WinView's patent portfolio and explaining that it covered live and mobile sports betting and WinView's paid-entry skill games.

123.    Instead of a meeting, Mr. Robbins arranged a January 22, 2019 phone call between Chrissie Goman, DraftKings' Vice President of Corporate Development, Mr. Lockton, and Mr. Rogers.    During this meeting, the participants discussed WinView's patents and patented technology platform.

124.    Mr. Robbins expressed interest in learning more and sent an NDA to WinView. The NDA stated that the parties will exchange confidential information for purposes of "pursuing a potential transaction between the parties."  Before signing the NDA, Mr. Lockton revised the NDA to expressly include the parties' agreement that, by entering into the NDA. WinView was not waiving "any of its ownership or enforcement rights to any of its patents."  Faisla Hasan, DraftKings' Deputy General Counsel, accepted the changes and signed and returned the NDA to Mr. Lockton.

125.    Mr. Lockton then sent a PowerPoint presentation specifically prepared for DraftKings which mentioned WinView Inc.'s 58 issued patents covering live and mobile sports betting.

126.    WinView personnel then had separate due diligence calls with Ms. Gorman and Ezra Kucharz, DraftKings' Chief Business Officer.  Following these calls, WinView Inc. then sent a PowerPoint presentation specifically prepared for DraftKings which mentioned WinView Inc.'s

then 58 issued patents covering live and mobile sports betting and stated that these "patents provide the foundational intellectual property for playing along with live sports—synchronization and lock out—and enable revenue generating from [the] entire marketplace."  WinView Inc.'s presentation to DraftKings further explained that its "patent portfolio covers both games of skill and games of chance," is intellectual property "centered on [the] ability to synchronize broadcast to multiple viewership supporting the most popular approach to sports betting," referenced that the patents cover synchronization between live broadcasts and in-game wagering and use lockouts to ensure wagering integrity.  The presentation also informed DraftKings that WinView Inc.'s over "1,200 individual [patent] claims eliminate potential work-arounds" and that one of its next steps was "finalizing patent litigation financing."

127.    DraftKings investigated WinView Inc. and its business as part of these discussions, including its patents.  To assist DraftKings with its due diligence, on March 8, 2019, Mark Richman, WinView's CFO, set up a secure data room for DraftKings.  WinView's data room included confidential PowerPoint presentations, operating information, and relevant patent information.

128.    WinView Inc.'s disclosures to DraftKings included detailed information regarding WinView Inc. and its patented technology.  During the discussions between WinView Inc. and DraftKings, DraftKings specifically requested information from WinView Inc. regarding its patents.  WinView Inc. provided DraftKings with an intellectual property "Status Report."  WinView Inc.'s Status Report specifically identified the respective parent patent applications for the asserted '883, '237, '189 and '770 Patents.  WinView Inc.'s Status Report further identified respective family members of the asserted '020, '771, '349, '402, and '880 Patents.

129.    WinView Inc. also provided DraftKings with a "Master Due Diligence" presentation in March 2019.  The diligence presentation highlighted WinView Inc.'s patented technology, its "foundational" patent portfolio, its willingness to provide a license to its intellectual property, and WinView Inc.'s proposed partnership with DraftKings.

130.    Several weeks later and after DraftKings had already investigated WinView Inc. and its patents, Mr. Gorman informed Mr. Rogers that the senior management of DraftKings was too busy with rolling out their new sports betting operation in New Jersey and "had no bandwidth" to further consider the WinView opportunity.

131.    In late 2020, WinView Inc. again proposed that DraftKings enter into a relationship with WinView Inc..  DraftKings declined to participate in such discussions.  Instead, DraftKings elected to continue its infringement of the Asserted Patents without permission.

132.    Because of DraftKings' ongoing infringement of WinView Inc.'s patents and unwillingness to participate in discussions regarding WinView's intellectual property, WinView, Inc. filed suit against DraftKings on July 7, 2021, asserting that DraftKings infringes WinView's '243 and '543 Patents.  *WinView Inc. v. DraftKings, Inc.*, No. 3:21-cv-13405 (D.N.J.) ("*DraftKings I*"), Dkt. 1.  On July 28, 2021 and November 15, 2021, WinView Inc. filed amended complaints, adding counts based on DraftKings' infringement of WinView's '730 and '988 Patents.  *Id.*, Dkt Nos. 7, 26.  WinView's complaints alleged in detail how the DraftKings' Sportsbook and Daily Fantasy Sports websites and mobile applications infringe the patents WinView asserted in *DraftKings I*, that are family members of the Asserted Patents, as specified above.

133.    From all of the above, DraftKings had knowledge of the Asserted Patents prior to the filing of this action and is further aware of infringement of WinView's Asserted Patents from its receipt this Complaint.

## COUNT I
### (Direct Infringement of U.S. Patent No. 11,185,770)

134.     WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

135.     In violation of 35 U.S.C. § 271(a), DraftKings directly infringed and continues to infringe the '770 Patent, including without limitation exemplary Claim 20, by making, using, importing, selling, and offering for sale in the United States DraftKings Sportsbook and Casino, DraftKings Casino, and DK Horse (the "'770 Accused Products").

136.     As set forth above in the Section entitled The Parties, Defendants DraftKings Inc., DK Crown Holding, Crown Gaming, SBTech US, and SBTech Global operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

137.     DraftKings' acts of making, using, importing, selling, and offering for sale the infringing '770 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, DraftKings declined WinView's request that DraftKings partner with WinView.

138.     DraftKings' infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents

139.     DraftKings owns and controls the operation of the '770 Accused Products and generates substantial financial revenues therefrom.  DraftKings puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '770 Accused Products are hosted on AWS servers, as discussed above, DraftKings controls the operation of the servers, puts them into use, and obtains the benefits of their use by

using its software hosted on the AWS servers to operate the '770 Accused Products in order to generate revenue.

140.    To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

141.    DraftKings also has directly infringed and continues to directly infringe the '770 Patent by having its employees test and use the '770 Accused Products in the United States, performing the claimed methods.  In order to maintain legal compliance, DraftKings is required to periodically monitor and ensure that the '770 Accused Products are performing as designed and intended.  DraftKings further directly infringes by marketing and distributing the '770 Accused Products, which constitutes infringing offers to sell and sales.

142.    By way of example of DraftKings' infringement of the '770 Patent, the '770 Accused Products meet all of the limitations of exemplary Claim 20 of the '770 Patent, which recites:

20. A method of implementing a game of skill or chance or other entertainment comprising:

determining a geographic location of each device of a set of devices;

providing a content stream to each device based on the geographic location;

providing the game of skill or chance or other entertainment with the content stream, wherein the game of skill or chance or other entertainment involves users making selections related to events that occur within the content stream;

preventing entry of a selection in the game of skill or chance or other entertainment after a result is known by sending a lockout signal, utilizing a person attending the events related to the streaming content, to prevent the users from submitting a response to the game of skill or chance or other entertainment; and

delivering the content stream and synchronized game data to each device of the set of devices.

143.    The '770 Accused Products infringe the '770 Patent, including exemplary Claim 20, in violation of 35 U.S.C. § 271(a)-(c).    For example, they perform the recited method of implementing a game, as discussed below.

144.    DraftKings allows users to bet on sports matches, daily fantasy leagues, and casino game livestreams.  *See* Ex. 13 (DraftKings 10-K) at 3 ("We provide users with online sports betting ("Sportsbook"), online casino ("iGaming") and daily fantasy sports ("DFS") product offerings, as well as retail sportsbook, media and other consumer product offerings.").  These product offerings are available on Apple iOS and iPadOS via the Apple Store, Android via the Google Play store, and traditional and mobile websites.  *Id.* at 7.  The mobile apps offer the same product offerings as the traditional website.  The '770 Accused Products involves games of chance.  *See, e.g.*, *id.* at 17 ("The sports betting and iGaming industries are characterized by an element of chance.").

145.    DraftKings provides the DraftKings Sportsbook and Casino websites and the associated mobile applications.  The DraftKings Sportsbook and Casino offerings may be accessed online at sportsbook.draftkings.com and casino.draftkings.com respectively and by using the DraftKings Sportsbook and Casino Apps on mobile devices such as a smartphone, tablet, or computer.

146.    DraftKings determines the geographic location customers' devices and provides content streams to each device based on the geographic location of the device.  For example, DraftKings Sportsbook determines the competitive group a user is eligible to compete in based on the geographic location of the device.  DraftKings is required by law to determine its customers' physical locations, as customers must be located in a state that allows the type of wager they seek to place.  DraftKings uses GPS, Bluetooth, Wi-Fi location services to determine the location of

customer devices.  *See, e.g.,* Ex. 27 (https://help.draftkings.com/hc/en-us/articles/4405236822931-Using-DraftKings-with-GeoComply-Location-Services-Overview-US).



Ex. 27 (https://help.draftkings.com/hc/en-us/articles/4405236822931-Using-DraftKings-with-GeoComply-Location-Services-Overview-US).

147.    DraftKings Sportsbook provides content streams to each customer device based on its geographic location.  There are two types of live stream features available in DraftKings Sportsbook—"Live Stream" and "Game Tracker." DraftKings also uses the geographic information to determine whether a user can watch the live stream of a game.  If a user is within a state that allows sports betting, the user may stream the game.  For example, below is screenshot of DraftKings Sportsbook Application (in the example, on an Apple device) showing the live stream features of the DraftKings Sportsbook mobile application.





(screenshot of the live stream feature in the DraftKings Sportsbook app).

(screenshot of the game tracker feature in the DraftKings Sportsbook app).

148.    If the user is in a location where sports betting is not allowed, DraftKings does not allow streaming of a game.  For example, below is a screenshot of DraftKings Sportsbook app on an Apple device notification stating that live streaming is not available for a certain location.

69



(screenshot of DraftKings Sportsbook App notification stating that live streaming is not available for the location).

149.    Similarly, a user is unable to view the Game Tracker where a location cannot be verified and the Game Tracker is available.



(screenshot of DraftKings Sportsbook website not displaying the game tracker when the location cannot be verified).

150.    DraftKings Casino provides content streams and live video streams to customers' devices based on their geographic location.  If a customer is within a state that allows iGaming, the customer will have access to the live streams of the game.

71



(screenshot of the DraftKings Casino app showing a live stream of a roulette game).

151.    For customers in jurisdictions that do not allow iGaming, the DraftKings Casino app will prevent access to the streams for prohibited games.  For example, below is a screenshot of the DraftKings Casino app on an Apple device showing that a user is blocked from accessing a stream for a casino game because of a geographic restriction.



(screenshot of the DraftKings Casino app blocking access to the stream for a casino game due to the device's geographic location).

152.    The '770 Accused Products provide to customers games where the customers make selections related to events that occur within the streaming content. DraftKings provides betting options on the Sportsbook app that reflect the online broadcast of content, and offers live betting propositions. Customers can make wagers while a live sporting event is being played and streamed. DraftKings updates the odds and propositions as the action unfolds and in accordance with what happens in the live sporting event. DraftKings also removes betting propositions that have been resolved and adds new betting propositions as the sporting event progresses. For

example, the screenshot below shows the DraftKings Sportsbook mobile application providing Puck Line odds for the hockey match between Biel and Lausanne. DraftKings also allows a user to bet on the total (over/under) of goals scored.



(screenshot of live stream operation of DraftKings Sportsbook App). The screenshot from DraftKings' website below shows that DraftKings is providing game of skill entertainment, such as prop bets, to a first cohort of participants, during an event.

74



Ex. 51 (What is a Prop Bet?)

153. DraftKings provides gameplay in its Casino app that reflects real-world dealers' tables, allowing customers to experience remotely the live in-casino experience. For example, customers playing blackjack make selections related to events that occur within the blackjack stream, such as the decisions to bet, hit, stay, split, and double down.



(screenshot of the live stream feature in the
DraftKings Casino app).

154.    DraftKings prevents customers from entering selections (such as placing a wager)

after a result is known by sending a lockout signal, utilizing a person in physical attendance at the

event to determine when to trigger the lockout signal. *See, e.g.*, Powering Our Sportsbook Product

(https://www.youtube.com/watch?v=qr5HR_vvSWw) at 9:45-10:46.  For example, the person in

attendance sends a signal that triggers DraftKings to send a lockout signal to the '770 Accused

Products to stop accepting bets.

155.    DraftKings supplements its real-time data with data provided by SportRadar and

BetGenius.  Ex. 13, DraftKings 10-K ("We rely on third-party sports data providers such as

SportRadar and BetGenius to obtain accurate information regarding schedules, results, performance and outcomes of sporting events."). Sportradar uses data scouts (or data journalists) that are physically present at games to send event data to its servers. *See* Sportradar's Live Scouting Data Journalists in Action (https://www.youtube.com/watch?app=desktop&v=5WGY-Vu9ZZg) (SportRadar data scout explaining that while watching the game at the venue he "use[s] specialty software to record every event that happens. . . . As soon as [he] see[s] it happen [he] press[es] the button [on the software]. [He] enter[s] it into the system and it goes live].); *see also*, Ex. 53, Baseball API Documentation ("Data is collected via Sportradar on-venue scouts and in-house operators."); Ex. 54, Basketball API Documentation (same); Ex. 55, Football API Documentation (same); Ex. 56, Hockey API Documentation (same); Ex. 57, Soccer API Documentation (same). DraftKings uses this data to trigger the lockout signal.

156.    DraftKings Sportsbooks betting works as a "shopping cart." Players can place bets before or during the game. Upon triggering a lockout signal, a bet becomes unavailable, the odds offering will turn converted to a greyed-out lock symbol and player will not be able to add this selection to the bet slip, and the user will receive a notification that the bet is closed.

157.    Below are screenshots of DraftKings' Sportsbooks App, showing a cart before and after a bet is closed.




(screenshot of DraftKings Sportsbook App showing a cart before a bet is closed).

(screenshot of DraftKings Sportsbooks App showing a cart after a bet is closed).

158.   Similarly, with respect to DraftKings Casino, after customers' devices receive a lockout signal, the customers are prevented from placing a bet when outside of the allotted period.

159.   DraftKings deliver the content stream and synchronized game data to each device of the set of devices, such as the customer devices running the '770 Accused Products in order to participate in a game of live-streamed roulette.  DraftKings uses its servers and AWS Cloud servers to provide synchronized game data through the '770 Accused Products, as discussed above.

160.    In addition, DraftKings presents the online broadcast of content and synchronized game data.  Users accessing the same page of the DraftKings Sportsbook website or same portion of the mobile application are presented with the same content, including available sports, betting propositions, game scores, and statistics.  DraftKings updates the odds and betting propositions in accordance with how the live sporting event is being played out in the online broadcast of content. DraftKings presents the online broadcast of content depicting what is happening in the sporting event with the synchronized game data constituting, for example, updated odds and propositions in the Sportsbook application.

161.    Thus, DraftKings' '770 Accused Products satisfy all elements of exemplary Claim 20 of the '770 Patent.

162.    U.S. Patent Application No. 16/909,661 was issued as the '770 Patent on November 30, 2021.  For the reasons discussed above in the Section entitled DraftKings' Knowledge of the Asserted Patents, DraftKings became aware of the '770 Patent and aware that its activities concerning the '770 Accused Products infringed the '770 Patent no later than upon its issuance on November 30, 2021.  At the very least, DraftKings became aware of its infringement of the '770 Patent from its receipt of this Complaint.

163.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, WinView is entitled to injunctive relief, damages, and attorney's fees and costs.

164.    In light of DraftKings' knowledge of WinView and the '770 Patent, DraftKings has deliberately infringed and continues to deliberately infringe in a wanton, malicious, and egregious manner, with reckless disregard for WinView's patent rights.  DraftKings' infringing actions have been and continue to be consciously wrongful.

165.    The Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to WinView pursuant to 35 U.S.C. § 285.

166.    WinView has suffered and continues to suffer irreparable harm as a direct and proximate result of DraftKings' infringement for which there is no adequate remedy at law.  Unless DraftKings is enjoined, WinView will continue to suffer such irreparable injury.

<div align="center">

**COUNT II**
**(Indirect Infringement of U.S. Patent No. 11,185,770)**

</div>

167.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

168.    As set forth above, DraftKings has had knowledge of its infringement of WinView's '770 Patent since at least as early as November 30, 2021 and has further knowledge of the '770 Accused Products' infringement of the '770 Patent from the filing of this Complaint.

169.    As set forth above, the '770 Accused Products directly infringe the '770 Patent. DraftKings has induced and continues to induce its customers' direct infringement of one or more claims of the '770 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '770 Patent by using the '770 Accused Products.

170.    DraftKings knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '770 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '770 Accused Products are used to gamble, they necessarily infringe the '770 Patent.  Therefore, DraftKings' encouragement

of its customers to use the '770 Accused Products to gamble necessarily encourages its customers to directly infringe the '770 Patent.

171.    As an example of DraftKings' active encouragement of its customers' direct infringement, DraftKings makes its Sportsbook and Casino products conveniently accessible by offering the services on its website and mobile applications for Android, iOS, and iPadOS.





(screenshot of DraftKings Sportsbook & Casino as available for iOS from the Apple App Store).

(screenshot of Casino App as available for iOS from the Apple App Store).





(screenshot of DraftKings Sportsbook & Casino App as available for Android devices from the Google Play Store).

(screenshot of DraftKings Casino App as available for Android devices from the Google Play Store).



(screenshot of DraftKings Sportsbook & Casino App for iPadOS as available from the Apple App Store).



(screenshot of DraftKings Casino App for iPadOS as available from the Apple App Store).

172.    DraftKings further encourages customers to actively engage with its platform by providing comprehensive resources through its Help Center, an FAQ site designed to assist customers.  Through its Help Center, DraftKings offers detailed guides on how to play various games and understand the underlying concepts.  For example, DraftKings provides customers with sections like *How to Play - Sportsbook*, *How to Place a Bet on DraftKings;* and *How to Play Casino Games*.  Ex. 58 (How to Play - Sportsbook); Ex. 40 (How do I place a bet on DraftKings); Exs. 36, 59 (How to Play Casino Games).  As explained above, following these instructions to gamble will necessarily result in customers infringing the '770 Patent.

173.    Additionally, DraftKings offers practical instructions on its website for navigating its platform, such as *How to Bet 101: Sports Betting Explained* and *How to Play Online Casino Games*.  DraftKings provides instructions on how to use the actual Accused Product platforms. Ex. 35 (Sports Betting Explained), Ex. 36 (How to Play Online Casino Games).

174.    DraftKings' marketing aims to recruit new customers, reengage former customers, and retain current customers via different marketing strategies.  Ex. 13 at 60-61 (DraftKings 10-K) ("We grow our business by attracting new paid users to our product offerings and increasing their level of engagement with our product offerings over time.  To effectively attract and retain paid users and to re-engage former paid users, we invest in a variety of marketing channels in combination with personalized customer promotions, most of which can be used across all of our product offerings (such as free contest entries or bets or matching deposits).  These investments and personalized promotions are intended to increase consumer awareness and drive engagement.").

175.    All the elements of the claims of the '770 Patent are used by DraftKings and its customers, purchasers, users, developers, vendors, and manufacturers, or a combination thereof.  As set forth above, DraftKings has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with DraftKings, one or more claims of the '770 Patent.

176.    DraftKings also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '770 Patent pursuant to 35 U.S.C. § 271(c).  As discussed above, DraftKings has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '770 Accused Products within the United States, without authority from WinView, it is providing the '770 Accused Products which are materials and apparatuses for practicing the claimed inventions of one or more claims of the '770 Patent.  The '770 Accused Products are software programs that are material components of the systems infringing one or more claims of the'770 Patent.  The '770 Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses.  As discussed above,

when the '770 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '770 Patent.

177.    DraftKings' indirect infringement of the '770 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

178.    DraftKings' indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

179.    DraftKings' indirect infringement of the '770 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

180.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' indirect infringement.

## COUNT III
### (Direct Infringement of U.S. Patent No. 11,235,237)

181.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

182.    In violation of 35 U.S.C. § 271(a), DraftKings directly infringed and continues to infringe the '237 Patent, including without limitation exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States the DraftKings Sportsbook and Casino and DK Horse (the "'237 Accused Products").

183.    As set forth above in the Section entitled The Parties, Defendants DraftKings Inc., DK Crown Holding, Crown Gaming, SBTech US, and SBTech Global operate as a single,

consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

184.    DraftKings' acts of making, using, importing, selling, and offering for sale the infringing '237 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, DraftKings declined WinView's request that DraftKings partner with WinView.

185.    DraftKings' infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents

186.    DraftKings owns and controls the operation of the '237 Accused Products and generates substantial financial revenues therefrom.  DraftKings puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '237 Accused Products are hosted on AWS servers, as discussed above, DraftKings controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '237 Accused Products in order to generate revenue.

187.    To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

188.    DraftKings also has directly infringed and continues to directly infringe the '237 Patent by having its employees test and use the '237 Accused Products in the United States.  In order to maintain legal compliance, DraftKings is required to periodically monitor and ensure that the '237 Accused Products are performing as designed and intended.  DraftKings further directly

infringes by marketing and distributing the '237 Accused Products, which constitutes infringing offers to sell and sales.

189.    By way of example of DraftKings' infringement of the '237 Patent, the '237 Accused Products meet all of the limitations of exemplary Claim 1 of the '237 Patent, which recites:

> 1. A method of equalizing effects of latency issues in synchronization of display of data files on an Internet coupled device with a live event, wherein a game of skill or chance or entertainment is run in conjunction with the live event and wherein the game of skill or chance or entertainment comprises data files, the method comprising:
>
>> a. storing the data files on a server which relate to the live event;
>>
>> b. determining one or more game elements in the live event; and
>>
>> c. transmitting the files from the server to each of a plurality of Internet coupled devices corresponding to the one or more game elements; and
>>
>> d. sending a lockout signal to prevent users from submitting a response to the game of skill or chance or other entertainment after a result of the game element has been revealed within the live event, wherein determining a time of the lockout signal includes utilizing a person observing a television feed located remotely from the live event.

190.    The '237 Accused Product infringes the '237 Patent, including exemplary Claim 20, in violation of 35 U.S.C. § 271(a)-(c).  For example, they perform the recited method of equalizing effects of latency, as discussed below.

191.    The '237 Accused Products are entertainment services that enables users to conduct sports betting in real-time.  Ex. 13 at 3 ("We are a digital sports entertainment and gaming company [that] provide[s] users with online sports betting ('Sportsbook')").  Sports betting is characterized as a game of chance.  Ex. 13 at 17 (DraftKings 10-K) ("The sports betting and iGaming industries are characterized by an element of chance"); Ex. 29 (Live Betting – How to Bet 101) ("Live betting allows you to bet in real-time while the action is unfolding.").  A user places bets in DraftKings

Sportsbook based on televised sports events (e.g., NFL games) or in DK Horse based on televised horse races.  Ex. 60 (Ways to Watch).

192.    DraftKings equalizes latency effects on its customer devices when using the DraftKings Sportsbook app.  DraftKings does this by modulating the amount of delay, if any, based on the latency of a user's device.  As noted in its House Rules, "[a]ll bets placed through any DraftKings platform, including but not limited to bets requesting manual approval, may be subject to a time delay prior to acceptance, the length of which may vary.  Such delay is to be determined by DraftKings in its sole discretion."   Ex. 61 at 2 (General Rules | DraftKings Sportsbook)

193.    DraftKings operates servers within each jurisdiction in which it offers the '237 Accused Products, as states generally require that DraftKings' servers be located within their boundaries in order to operate.  *See, e.g.*, N.Y. PML § 1367-A(h)-(i) ("The server or other equipment which is used by a mobile sports wagering licensee to accept mobile sports wagering shall be physically located in the licensed gaming facility"); N.J.S.A §§ 5:12A-11(a); 5:20-2(c) ("all equipment used by the holder of the permit, including computers and servers, to conduct fantasy sports activities shall be physically located within the boundaries of" "a restricted area on the premises of the casino hotel or in another facility owned or leased by the casino licensee . . . that is secure, inaccessible to the public").  N.J.S.A § 5:12-95.22; 68 IAC 27-6-2 ("A sports wagering operator must locate a server in the state of Indiana.").  These servers communicate with customers' devices, which allow customers to operate the ''237 Accused Products on their devices.

194.    In addition to its own servers, DraftKings use cloud-hosted services to support the operation of the '237 Accused Products.  Specifically, DraftKings uses AWS' Lambda function as a service.  Reviewing the network traffic of an Accused Product illustrates DraftKings' use of

AWS' S3 (object storage system) and CloudFront (content delivery network) services which implement with Lambda. *See* Ex. 47 (DraftKings' technology profile illustrating it uses AWS services such as CloudFront S3).



(screenshot of DraftKings' network traffic with X-Amz-Id-2 in the response header); *see also* Ex. 45 (listing X-Amz-Id-2 as an AWS response header).

(screenshot of DraftKings' network traffic with X-Amz-Cf-Id in the response header); *see also* Ex. 46 (listing X-Amz-Cf-Id as an AWS response header).

195.    DraftKings' SEC filings further confirm the use of AWS services.   Ex. 13 (DraftKings 10-K) ("[DraftKings] rel[ies] on Amazon Web Services to deliver [its] product offerings to users," and "[it] host[s] certain of [its] product offerings and support [its] operations using Amazon Web Services ("AWS"), a third-party provider of cloud infrastructure services, along with other service providers.").

196.    DraftKings has direction and control over AWS' servers via its services.   As discussed above, the AWS' Customer Agreement states that DraftKings is responsible for its

content, proper configuration and use of AWS services, and its end users' compliance with DraftKings agreement with AWS, acknowledging that AWS does not provide support and services to DraftKings' customers.  Ex. 48 (AWS Customer Agreement).

197.    Additionally, AWS' data privacy terms specify that "[DraftKings] maintain[s] full control of [its] content that [it] uploads to the AWS services . . . , and [is] responsib[le] for configuring access to AWS services and resources. . . . [DraftKings] configure[s] access control permissions for any of the services [it] develop[s] or deploy[s] in an AWS environment.  [AWS] do not access or use [DraftKings'] content for any purpose without [its] agreement."  Ex. 49 (Data Privacy FAQs).

198.    On these servers, DraftKings stores various data files related to the game that a customer is betting on, including historical game data, user bets, and bet results.  For example, the screenshot below shows that a user's bets are sent to and retrieved from DraftKings' servers.





(screenshot of DraftKings Sportsbook App showing bet being submitted by a user and being sent to DraftKings' servers).

(screenshot of DraftKings Sportsbooks App showing a user pulling current bets for a game from DraftKings' servers).

199.    Customers can also retrieve their active bet data from a device from the device they used to place the bet, which demonstrated that the bet data are saved to DraftKings' server and not just stored locally on the customers' devices.

91



(screenshot of the DraftKings Sportsbook website showing ability to retrieve bet data).

200.    DraftKings determines the status of the games for which it is accepting wagers (game elements).  DraftKings uses its own algorithm in combination with third-party, real-time data to determine odds for live events that are sent to users.  Companies like SportRadar and BetGenius provide real-time data to DraftKings.  Ex. 13 at 22 (DraftKings 10-K) ("We rely on third-party sports data providers such as SportRadar and BetGenius to obtain accurate information regarding schedules, results, performance and outcomes of sporting events.").  SportRadar uses data scouts (or data journalists) that are physically present at games to send event data to DraftKings' servers.    *See* *Sportradar's Live Scouting Data Journalists in Action* (https://www.youtube.com/watch?app=desktop&v=5WGY-Vu9ZZg)  (Sportradar data scout explaining that while watching the game at the venue he "use[s] specialty software to record every event that happens. . . . As soon as [he] see[s] it happen [he] press[es] the button [on the software]. [He] enter[s] it into the system and it goes live].); *see also*, Ex. 53, Baseball API Documentation

("Data is collected via Sportradar on-venue scouts and in-house operators."); Ex. 54 (Basketball API Documentation) (same); Ex. 55 (Football API Documentation) (same); Ex. 56 (Hockey API Documentation) (same); Ex. 57 (Soccer API Documentation) (same).

201.    The diagram below illustrates the architecture that DraftKings uses for the odds determination based on the game element data that it receives.



Ex. 62 (Intro — Sports Intelligence @ DraftKings | by Robin Mohseni | DraftKings Engineering | Medium).

202.    DraftKings' servers transmit data files to customers' devices corresponding to the game element data that DraftKings' collects.  DraftKings sends these game data updates to its customers so the '237 Accused Products can provide up-to-date data as close to real-time as possible.  As shown in the diagram below, the data contained in the Event Stream Topic (game data) are sent to the Event Stream Topic Single consumer group (plurality of customers betting in an event) where Ledger Topic consumer groups A-C (individual customers) receive the data.  This

data can include the updated odds for propositions and in-game betting options and the statistics for the game.



Ex. 63 (Apache Kafka as a centralized state management platform — Part 2).

203.    DraftKings sends a lockout signal to prevent customers from entering selections in the games by relying on a producer or bookmaker observing a low-latency television feed located remotely from the event in order to determine when to trigger the lockout signal (DraftKings relies on a combination of both an in-person observer and a remote observer).  *See, e.g.*, Powering Our Sportsbook Product (https://www.youtube.com/watch?v=qr5HR_vvSWw) at 9:45-10:46.   The lockout signal can also involve other inputs, including lockouts from people viewing the event at interest remotely. Ex. 65 (Wizards of Odds: The Science and Hard Work of Trading Teams) ("While games are in progress, traders then monitor the action and check all the data for accuracy throughout the day.  They can also move or suspend lines if needed.").

204.    DraftKings Sportsbook's betting procedure works as a "shopping cart."  Customers can place bets before or during the game.  If a bet becomes unavailable, customers will receive a lockout signal: the odds offering will convert from an active betting option (such as the "Konrad Kulpa – 600" moneyline bet below) into a greyed-out lock symbol (such as the "Game 1 Point Winner" bet below), meaning that customers can no longer add this selection to their bet slips.



205.    If the locked-out bet is already in the cart, the user will receive a notification that the bet is closed.   The screenshots below illustrate a cart before and after DraftKings sends a lockout signal.




(screenshot of a DraftKings Sportsbook app)    (screenshot of the DraftKings Sportsbook app)

206.    Thus, DraftKings' '237 Accused Product satisfies all elements of exemplary Claim 1 of the '237 Patent.

207.    U.S. Patent Application No. 17/133,366 was issued as the '237 Patent on February 1, 2022.  For the reasons discussed above in the Section entitled DraftKings' Knowledge of the Asserted Patents, DraftKings became aware of the '237 Patent and aware that its activities concerning the '237 Accused Product infringed the '237 Patent no later than upon its issuance on

February 1, 2022. At the very least, DraftKings became aware of its infringement of the '237 Patent from its receipt of this Complaint.

208.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, WinView is entitled to injunctive relief, damages, and attorney's fees and costs.

209.    In light of DraftKings' knowledge of WinView and the '237 Patent, DraftKings has deliberately infringed and continues to deliberately infringe in a wanton, malicious, and egregious manner, with reckless disregard for WinView's patent rights. DraftKings' infringing actions have been and continue to be consciously wrongful.

210.    The Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to WinView pursuant to 35 U.S.C. § 285.

211.    WinView has suffered and continues to suffer irreparable harm as a direct and proximate result of DraftKings' infringement for which there is no adequate remedy at law. Unless DraftKings is enjoined, WinView will continue to suffer such irreparable injury.

### <u>COUNT IV</u>
### (Indirect Infringement of U.S. Patent No. 11,235,237)

212.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

213.    As set forth above, DraftKings has had knowledge of its infringement of WinView's '237 Patent since at least as early as February 1, 2024 and has further knowledge of the '237 Accused Products' infringement of the '237 Patent from the filing of this Complaint.

214.    As set forth above, the '237 Accused Product directly infringes the '237 Patent. DraftKings has induced and continues to induce its customers' direct infringement of one or more claims of the '237 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively,

and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '237 Patent by using the '237 Accused Product.

215. DraftKings knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '237 Accused Product, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games. As discussed above, when the '237 Accused Product is used to gamble, it necessarily infringes the '237 Patent. Therefore, DraftKings' encouragement of its customers to use the '237 Accused Product to gamble necessarily encourages its customers to directly infringe the '237 Patent.

216. As discussed in more detail above with respect to the '770 Patent, DraftKings encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '237 Accused Product, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '237 Accused Product in an infringing manner.

217. All the elements of the claims of the '237 Patent are used by DraftKings and its customers, purchasers, users, developers, vendors, and manufacturers, or a combination thereof. As set forth above, DraftKings has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with DraftKings, one or more claims of the '237 Patent.

218. DraftKings also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '237 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, DraftKings has done so with knowledge or willful blindness that by selling,

offering to sell, and operating the '237 Accused Product within the United States, without authority from WinView, it is providing the '237 Accused Product which is a material components of the systems infringing one or more claims of the '237 Patent. The '237 Accused Product is not a staple article or commodity of commerce suitable for substantial non-infringing uses. As discussed above, when the '237 Accused Product is used to gamble, which is its only substantial intended function, it infringes the '237 Patent.

219. DraftKings' indirect infringement of the '237 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

220. DraftKings' indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

221. DraftKings' indirect infringement of the '237 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

222. WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' indirect infringement.

## <u>COUNT V</u>
### (Direct Infringement of U.S. Patent No. 11,338,189)

223. WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

224. In violation of 35 U.S.C. § 271(a), DraftKings directly infringed and continues to directly infringe the '189 Patent, including without limitation exemplary Claim 24, by making,

using, importing, selling, and offering for sale in the United States DraftKings Fantasy Sports and DraftKings Pick6: Fantasy Game (the "'189 Accused Products").

225. As set forth above in the Section entitled The Parties, Defendants DraftKings Inc., DK Crown Holding, Crown Gaming, SBTech US, and SBTech Global operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

226. DraftKings' acts of making, using, importing, selling, and offering for sale the infringing '189 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, DraftKings declined WinView's request that DraftKings partner with WinView.

227. DraftKings' infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

228. DraftKings owns and controls the operation of its '189 Accused Products and generates substantial financial revenues therefrom.  DraftKings puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '189 Accused Products are hosted on AWS servers, as discussed above, DraftKings controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '189 Accused Products in order to generate revenue.

229. To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

230.    DraftKings also has directly infringed and continues to directly infringe the '189 Patent by having its employees test and use the '189 Accused Products in the United States.  In order to maintain legal compliance, DraftKings is required to periodically monitor and ensure that the '189 Accused Products are performing as designed and intended.  DraftKings further directly infringes by marketing and distributing the '189 Accused Products, which constitutes infringing offers to sell and sales.

231.    By way of example of DraftKings' infringement of the '189 Patent, the '189 Accused Products meet all of the limitations of exemplary Claim 24 of the '189 Patent, which recites:

> 24. A method programmed in a memory of a device comprising:
>
> a. generating a list of multiple contests of skill or chance to join;
>
> b. presenting the list of multiple contests of skill or chance to join, wherein the multiple contests of skill or chance correspond to one or more events;
>
> c. receiving user input including event selections related to the one or more events and to which of the multiple contests of skill or chance the selections are to be applied, wherein the event selections are separately applied to each of the selected multiple contests of skill or chance, wherein the event selections enable simultaneously and in real time participating in the selected multiple contests of skill or chance;
>
> d. storing results and standings based on the event selections, wherein the standings are based on the results, wherein the standings are separated for each of the multiple contests of skill or chance; and
>
> e. transmitting the standings to the device, wherein the multiple contests of skill or chance are selected from single entry contests and multiple entry contests.

232.    The '189 Accused Products infringe the '189 Patent, including exemplary Claim 24, in violation of 35 U.S.C. § 271(a)-(c).  For example, they comprise a software method programmed in the memory of computer devices, as discussed below.

233.    DraftKings' Daily Fantasy and Pick6 offerings are software that are stored in the memory of customers' electronic devices, such as smartphones and tablets.  Below are screenshots of DraftKings' Daily Fantasy and Pick6 mobile apps, on the Apple App Store.



(screenshot of DraftKings Pick6 App on Apple App Store).

(screenshot of DraftKings Daily Fantasy App on Apple App Store).

234.    Alternatively, DraftKings' Daily Fantasy and Pick6 can be accessed via websites on users' smartphones, tablets, and computers.  Below is a screenshot of DraftKings' Daily Fantasy and Pick6 websites.



(screenshot of DraftKings' Daily Fantasy website).



(screenshot of DraftKings' Pick6 website).

235.    The '189 Accused Products generate lists of contests that customers are allowed to join.  DraftKings provides applications that are configured for receiving information related to one or more events, including information based on the geographic location of the device.  DraftKings uses GPS, Bluetooth, Wi-Fi location services to determine the location of a device, and present contests that a user is legally able to join.  Ex. 27 (Using DraftKings with GeoComply Location Services - Overview (US)).

**Important Information**

To use DraftKings products, your physical location must be verified at time of use. This can be accomplished one of two ways, depending on the device and product you're using:

- **GPS/Bluetooth/Wi-Fi location services** is used for:
  - All DraftKings apps
  - Devices with built-in GPS/Bluetooth/Wi-Fi location services

- **GeoComply Player Location Check plugin** is used for:
  - Laptop or desktop computers
  - Devices that don't have built-in GPS/Bluetooth/Wi-Fi location services

Ex. 27.

236.    DraftKings provides users with state-specific bets to ensure that customers are physically located where Daily Fantasy is legal.  The '189 Accused Products identify the current geographic location of the users' mobile device or computer.  The DraftKings Daily Fantasy website and mobile application will allow users to participate in contests for prizes only in jurisdictions where Daily Fantasy is permitted.  *See, e.g.*, Ex. 23 (Where is DraftKings Fantasy Sports Legal?).

237.    In addition to location-based offerings, Daily Fantasy provides contests where eligibility is based on users' time on the platform, skill, or participation level.  For example, Daily Fantasy offers "Beginner Contests" which are available to players who have participated in fewer than 50 contests and have not earned an experience badge, allowing new users to compete against other beginners and avoid more skilled "sharks" who might otherwise dominate contests.  Similarly, DraftKings offers "Casual Contests" which are intended for players who have played over 50 contests but have not yet earned an experience badge, offering a space where intermediate players can continue to improve without facing highly skilled veterans.  Exs. 66, 67, and 68.



Ex. 66 (screenshot of exemplary Beginner Contest from DraftKings' website).

238.    Similarly, in DraftKings' "Where is Pick6 Available?" site, DraftKings identifies the states where Pick6 is legal.  Ex. 69 (Where is Pick6 Available?).  In the states not listed, customers cannot access Pick6.  Additionally, after determining the location of customers' devices, DraftKings confirms a secondary check of its customers' ages that is state-specific.  Ex. 70 (How to play Pick6?) ("Higher age limits may apply in some states."); *see also* Ex. 71, DraftKings Pick6 Review: What States Is DraftKings Legal? (providing a table of the age limits per state).  For example, a customer who is 18 cannot use Pick6 in Arizona, where the minimum age is 21, but can use Pick6 in Georgia, where the minimum age is 18.

239.    Based on these determinations, the '189 Accused Products present a list of contests that customers are eligible to join, which correspond to real-world events, such as NBA basketball games.

240.    After displaying the list of contests, the '189 Accused Products receive customer input related to the available contests, allowing the customers to make the same selections across multiple selected contests that can take place simultaneously.  DraftKings allows users to choose a league, team, lineup and place bets.  For example, DraftKings Daily Fantasy allows users to create one or more lineups and enter the lineups into multiple contests.  Each line up can be entered into a different competition.  Below are screenshots of DraftKings' Daily Fantasy Application (in the example, on an Apple device) showing that DraftKings Daily Fantasy allows a user to compete in distinct contests for each line up.  In the screenshot below, the user entered the "NBA $2 Double Up" and "NBA $20K And-One" contests with different line ups.  These contests will occur simultaneously and begin "TODAY AT 4:30 PM PST."



(screenshot from the DraftKings Daily Fantasy app). Similarly, with respect to Pick6, users can enter two different contests with different lineups. This is confirmed by the different contest IDs shown below.

  

(screenshot of the DraftKings Pick6 app).



(screenshot of DraftKings Daily Fantasy App showing a user can create a lineup to enter into contests).



(screenshot of DraftKings Daily Fantasy App showing a user can enter the lineup into other contests).




(screenshot of DraftKings Daily Fantasy App showing a user can enter the same contest with a different lineup).

(screenshot of DraftKings Daily Fantasy App showing a user can enter a different contest with a different lineup).

241.    Similarly, below are screenshots of DraftKings' Pick6 (in the examples, on an Apple device) showing that a user can create a lineup to join a competitive group, that can be used in different contests.



(screenshot of DraftKings Pick6 App showing a user can create a lineup for entry into a contest).



(screenshot of DraftKings Pick6 App showing a user can enter the lineup into multiple contests).







(screenshot of DraftKings Pick6 App showing the current lineup and allowing a user to "Play For More").

(screenshot of DraftKings Pick6 App showing that users can enter into additional contests with the same lineup by increasing their entry fee).

 

(screenshot of DraftKings Pick6 App showing a non-exhaustive list of the additional contests made available to the user with the increase in entry fee).

(screenshot of DraftKings Pick6 App showing a user can create another lineup to enter other contests.).

242.    DraftKings stores results from the events separated by the different contests, and then transmits those standings and results to customers' devices and computers to be displayed. DraftKings DFS gives users access to the GameCenter where "[e]ach contest's GameCenter provides all relevant information about the contest, from entry before the contest locks through the final results." Ex. 72 (GameCenter – Overview (US)). GameCenter provides real-time standings for all contests a user is participating in.

114

243.    DraftKings' GameCenter provides "a snapshot of the current standings (up to the top 500 entries) for the contest in progress, or the recap of the results for the completed contests." *Id.* "For contests that include more than 500 entries, each Team Name will be listed up to the 500th position, and after that only the last place Team Name for each prize tier will be listed." Ex. 73, Can I see my contest standings compared to others in GameCenter? (US). "For contests in progress, the standings will be updated regularly, and you'll see changes in rank as points are accumulated in real time." *Id.* "For contests that have been marked as completed, the standings will show each entry's final rank and prize position." *Id.*

244.    Standings include the information in the screenshot below.



Ex. 72 (GameCenter – Overview (US).

245.    Users can also view their standings directly in the DraftKings DFS.  For example, in the screenshot on the left, a user has entered into multiple contests and DFS shows their standings to the right of the entry.  As shown in the screenshot on the right, after selecting as specific contest users can view their ranking with respect to the other participants.

 

(screenshot of the live 'My Contests' tab where the live standings are shown)    (screenshot of the live 'My Contests' tab where the live standings are shown)

246.    The DraftKings Pick6 App also provides live standing of a user's Pick6 line up contests.





(screenshot of the live 'My Picks' tab where the live standings are shown)

(screenshot of the live 'My Picks' tab where the live standings are shown)

247.    The DraftKings DFS also provides the results of the contests.    In the Pick6

screenshot below, the DraftKings Pick 6 App summarizes all of the Pick6 line ups a user has

played.  A review of the first line up shows that the player had a $0.00 winnings.



Ex. 74 (How do I view my Pick 6 results?); Ex. 75.

    248.    After selecting the Total Entry dropdown, users can choose to review a breakdown of individual contest results.

 

(screenshot of results from an individual contest).      (screenshot showing results across multiple contests).

249.    Thus, DraftKings' '189 Accused Products satisfy all elements of exemplary Claim 24 of the '189 Patent.

250.    DraftKings' direct infringement of the '189 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty

251.    The USPTO issued U.S. Patent Application No. 17/024,330 as the '189 Patent on May 24, 2022. For the reasons discussed above in the Section entitled DraftKings' Knowledge of the Asserted Patents, DraftKings became aware of the '189 Patent and aware that its activities concerning the '189 Accused Products infringed the '189 Patent no later than upon its issuance on

May 24, 2022.  At the very least, DraftKings became aware of its infringement of the '189 Patent from its receipt of this Complaint.

252.    DraftKings' pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '189 Patent.

253.    DraftKings' infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

254.    As discussed above, DraftKings acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '189 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' direct infringement of the '189 Patent.

### COUNT VI
### (Indirect Infringement of U.S. Patent No. 11,338,189)

255.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

256.    As set forth above, DraftKings has had knowledge of its infringement of WinView's '189 Patent since at least as early as May 24, 2024 and has further knowledge of the '883 Accused Products' infringement of the '883 Patent from the filing of this Complaint.

257.    As set forth above, the '189 Accused Products directly infringe the '189 Patent. DraftKings has induced and continues to induce its customers' direct infringement of one or more claims of the '189 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively,

and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '189 Patent by using the '189 Accused Products.

258.    DraftKings knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '189 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '189 Accused Products are used to gamble, they necessarily infringe the '189 Patent.  Therefore, DraftKings' encouragement of its customers to use the '189 Accused Products to gamble necessarily encourages its customers to directly infringe the '189 Patent.

259.    As an example of DraftKings' active encouragement of direct infringement, DraftKings makes its Daily Fantasy and Pick6 products conveniently accessible by offering the services on its website and mobile applications for Android, iOS, and iPadOS.



(screenshot of DraftKings Pick6 App on Apple App Store on iOS).



(screenshot of DraftKings Daily Fantasy App on Apple App Store on iOS).



(screenshot of DraftKings Pick6 App on the Google Play Store).



(screenshot of DraftKings Daily Fantasy App on the Google Play Store).



(screenshot of DraftKings Daily Fantasy App on the Apple App Store on iPadOS).

260.    DraftKings further encourages customers to actively engage with its platform by providing comprehensive resources through its Help Center, an FAQ site designed to assist users. The Help Center offers detailed guides on how to play various games and understand the underlying concepts.  For example, it includes sections like How to Play Daily Fantasy Sports and *Glossary of Fantasy Sports Terms*.  Ex. 31 (How to Play Daily Fantasy Sports); Ex. 37 (Glossary of Fantasy Sports Terms).  Users are also provided with clear explanations of how DraftKings' contests work, including *Contest Distribution and Prizing*.  Ex. 42 (How it Works – Contest Distribution and Prizing).




Ex. 31 (screenshot of How to Play Daily Fantasy Sports).

Ex. 42 (screenshot of How it Works – Contest Distribution and Prizing).

261.    Additionally, DraftKings offers practical instructions on its website for navigating its platform, such as *How to place a bet on DraftKings*, *How to enter a Fantasy Sports contest*, and *How to make Picks*.  DraftKings provides instructions on how to use the actual Accused Product platforms.  Ex. 40 (How do I place a bet on DraftKings); Ex. 34 (How do I enter a Fantasy Sports contest?); Ex. 41 (How do I make Picks?).

 

Ex. 41 (screenshot of How do I make Picks?).

Ex. 34 (screenshot of How do I enter a Fantasy Sports contest?).

262.    As discussed above, DraftKings also actively markets its Accused Products through several channels, including social media advertisements, sponsored content, in-casino advertisements, billboards, DraftKings' websites, and traditional media.

263.    DraftKings' marketing aims to recruit new customers, reengage former customers, and retain current customers via different marketing strategies. Ex. 13 at 60-61 (DraftKings 10-K) ("We grow our business by attracting new paid users to our product offerings and increasing their level of engagement with our product offerings over time. To effectively attract and retain paid users and to re-engage former paid users, we invest in a variety of marketing channels in combination with personalized customer promotions, most of which can be used across all of our product offerings (such as free contest entries or bets or matching deposits). These investments

and personalized promotions are intended to increase consumer awareness and drive engagement.").

264.    All the elements of the claims of the '189 Patent are used by DraftKings and its customers, purchasers, users, developers, vendors, and manufacturers, or a combination thereof. As set forth above, DraftKings has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with DraftKings, one or more claims of the '189 Patent.

265.    DraftKings also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '189 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, DraftKings has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '189 Accused Products within the United States, without authority from WinView, it is providing the '189 Accused Products which are material components of the systems infringing one or more claims of the '189 Patent.  The '189 Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses.  As discussed above, when the '189 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '189 Patent.

266.    DraftKings' indirect infringement of the '189 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

267.    DraftKings' indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

268.    DraftKings' indirect infringement of the '189 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award

to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

269.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' indirect infringement.

## COUNT VII
### (Direct Infringement of U.S. Patent No. 11,451,883)

270.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

271.    In violation of 35 U.S.C. § 271(a), DraftKings directly infringed and continues to directly infringe the '883 Patent, including without limitation exemplary Claim 20, by making, using, importing, selling, and offering for sale in the United States DraftKings Sportsbook and Casino, DK Horse, DraftKings Casino, DraftKings Fantasy Sports, and DraftKings Pick6: Fantasy Game (the "'883 Accused Products").

272.    While the '883 Patent includes both method claims and non-method claims, WinView is only asserting the method claims of the '883 Patent and is not asserting any non-method claims of the '883 Patent.  The marking requirement of 35 U.S.C. § 287(a), therefore, does not apply to WinView's request for pre-suit damages for the '883 Patent because WinView is only asserting method claims from the '883 Patent.

273.    As set forth above in the Section entitled The Parties, Defendants DraftKings Inc., DK Crown Holding, Crown Gaming, SBTech US, and SBTech Global operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

274.    DraftKings' acts of making, using, importing, selling, and offering for sale the infringing '883 Accused Products have been without the permission, consent, authorization, or

license of WinView.  Indeed, DraftKings declined WinView's request that DraftKings partner with WinView.

275.    DraftKings' infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents

276.    DraftKings owns and controls the operation of the '883 Accused Products and generates substantial financial revenues therefrom.  DraftKings puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '883 Accused Products are hosted on AWS servers, as discussed above, DraftKings controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '883 Accused Products in order to generate revenue.

277.    To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

278.    DraftKings also has directly infringed and continues to directly infringe the '883 Patent by having its employees test and use the '883 Accused Products in the United States.  In order to maintain legal compliance, DraftKings is required to periodically monitor and ensure that the '883 Accused Products are performing as designed and intended.  DraftKings further directly infringes by marketing and distributing the '883 Accused Products, which constitutes infringing offers to sell and sales.

279.    By way of example of DraftKings' infringement of the '883 Patent, the '883 Accused Products meet all of the limitations of exemplary Claim 20 of the '883 Patent, which recites:

20. A method of implementing a consumer service with a server comprising:

transmitting a set of service related information to an application;

receiving a selection related to the consumer service;

transmitting a set of selection information related to the selection from the server to a mobile Internet-connected computing device;

receiving additional information based on a user's execution of the application on the mobile Internet-connected computing device;

transmitting a list of assets necessary for executing the application, wherein the assets necessary for executing the application directly affect the operation of the application; and

transmitting only a second set of assets within the list of assets that are not already resident on the mobile Internet-connected computing device.

280.    The '883 Accused Products infringe the '883 Patent, including exemplary Claim 20, in violation of 35 U.S.C. § 271(a)-(c).  For example, they perform the recited method of implementing a consumer service via a server, as discussed below.

281.    DraftKings performs the method implemented on a server device that interacts with an app or webpage which is downloaded to a device in order to implement the '883 Accused Products.  These product offerings are provided by DraftKings from servers.  Ex. 13 (DraftKings 10-K) at 19 ("We host certain of our product offerings and support our operations using Amazon Web Services ('AWS'), a third-party provider of cloud infrastructure services, along with other service providers").  As discussed above, DraftKings is using AWS' Lambda function as a service. Reviewing the network traffic illustrates DraftKings' use of AWS' S3 (object storage system) and CloudFront (content delivery network) services.  *See* Ex. 47 (DraftKings' technology profile illustrating it uses AWS services such as CloudFront S3).

| ▾ General | |
|---|---|
| Request URL: | https://www.draftkin |
| Request Method: | GET |
| Status Code: | 🟢 200 OK |
| Remote Address: | [2600:1406:3a00:a: |
| Referrer Policy: | strict-origin-when-c |

| ▾ Response Headers | |
|---|---|
| Accept-Ranges: | bytes |
| Access-Control-Allow-Credentials: | true |
| Access-Control-Allow-Origin: | * |
| Access-Control-Expose-Headers: | Date,ETag,calculatio |
| Cache-Control: | public, max-age=43 |
| Content-Length: | 51708 |
| Content-Type: | application/octet-str |
| Date: | Fri, 25 Oct 2024 05: |
| Etag: | "515a8af481f298b6 |
| Last-Modified: | Tue, 08 Oct 2024 17 |
| Strict-Transport-Security: | max-age=2628000 ; |
| X-Amz-Id-2: | 3f13S+8ll0+wvLE8S |
| X-Amz-Request-Id: | E6MPAQ79M3SXH9 |
| X-Amz-Server-Side-Encryption: | AES256 |
| X-Content-Type-Options: | nosniff |
| X-Frame-Options: | SAMEORIGIN |

(screenshot of DraftKings' network traffic with X-Amz-Id-2 in the response header); *see also* Ex. 45 (listing X-Amz-Id-2 as an AWS response header).

| ▾ General | |
|---|---|
| Request URL: | https://d2tjpz01y5bfgl |
| Request Method: | GET |
| Status Code: | 🟢 200 OK (from disk |
| Remote Address: | 52.222.231.20:443 |
| Referrer Policy: | strict-origin-when-cro |

| ▾ Response Headers | |
|---|---|
| Accept-Ranges: | bytes |
| Age: | 44916 |
| Content-Length: | 7691 |
| Content-Type: | image/png |
| Date: | Thu, 24 Oct 2024 16: |
| Etag: | "b06aa4c1d2fc7815c( |
| Last-Modified: | Mon, 14 May 2018 15: |
| Server: | AmazonS3 |
| Via: | 1.1 6ecf574c848f26ft |
| X-Amz-Cf-Id: | k32I9FMf50uqqiVifpe |
| X-Amz-Cf-Pop: | SFO5-C3 |
| X-Cache: | Hit from cloudfront |

(screenshot of DraftKings' network traffic with X-Amz-Cf-Id in the response header); *see also* Ex. 46 (listing X-Amz-Cf-Id as an AWS response header).

282.    DraftKings' SEC filings further confirm its use of AWS services to implement the '883 Accused Products.  Ex. 13 at 19 (the DraftKings 10-K) ("We rely on Amazon Web Services to deliver our product offerings to users," and "[w]e host certain of our product offerings and support our operations using Amazon Web Services ("AWS"), a third-party provider of cloud infrastructure services, along with other service providers.").  DraftKings' use of AWS and it supporting operation for DraftKings Sportsbook and Casino is at the direction and control of DraftKings.

283.    In order to operate the '883 Accused Products, DraftKings transmits a set of service related information to the '883 Accused Products on customers' devices.  For example, when users open the DraftKings Sportsbook and Casino app and are authenticated, they are presented with the

home screen.   Customers are then provided with a variety of information about the services available to them through the '883 Accused Products, such as promotions, a list of current games, and quick links to, for example, DraftKings' different sports offerings and product offerings, such as DraftKings Casino and Pick6.



(screenshot of the DraftKings Sportsbook and Casino app showing service related information sent to customer's device).

284.    DraftKings customers then make selections based on the consumer service information provided to them by the '883 Accused Products.  For example, in the screenshot above, a user can select "In Game" to view all of the live betting available at a moment in time.  In

response to the selection of "In Game" betting, customers receive and are presented with a list of options, including the following basketball games: the Portland Trail Blazers vs. the Charlotte Hornets, the Cleveland Cavaliers vs. the Philadelphia 76ers, and the New Orleans Pelicans vs. the Memphis Grizzlies. These options are shown in the screenshot below.



(screenshot of DraftKings Sportsbook App showing a list of available games).

285.    DraftKings transmits a list of assets necessary for executing the application, wherein the assets necessary for executing the application directly affect the operation of the application. Throughout the duration of the game, DraftKings continuously communicates with customers devices that are running the '883 Accused Products in order to provide information such

as real-time game statistics and betting information during a live gaming event. In order to do so, DraftKings send lists of assets to a user's device which can be compared to the existing list of assets on the device or subsequent lists that are generated on the device. Ex. 76 (What Is a Live Bet?).



*Id.*

286.    The continuous communication of new assets not previously received by the customer's device is shown by looking at the network traffic for an in-game bet. The screenshot below illustrates that the '883 Accused Products operating on customers' devices subscribe to data streams after connecting to a live bet, indicating that DraftKings' servers are transmitting the new data assets not already located on the customer's device. The entries that begin '{"event":"Event", "data":' are examples of a list of assets, with the green arrow indicating a message transmitted

from a customer's device and received by DraftKings' servers and the red arrow indicating a message that DraftKings' servers transmit to the customer's device.

| Data |
|------|
| ❗ {"event":"pusher:connection_established","data":"{\"socket_id\":\"27584.26536606\",... |
| ❗ {"event":"pusher:subscribe","data":{"channel":"prod-corsair-30357853"}} |
| ❗ {"event":"pusher:subscribe","data":{"channel":"prod-corsair-30358154"}} |
| ❗ {"event":"pusher:subscribe","data":{"channel":"prod-corsair-30316262"}} |
| ❗ {"event":"pusher_internal:subscription_succeeded","data":{},"channel":"prod-corsai... |
| ❗ {"event":"pusher_internal:subscription_succeeded","data":{},"channel":"prod-corsai... |
| ❗ {"event":"pusher_internal:subscription_succeeded","data":{},"channel":"prod-corsai... |
| ❗ {"event":"Event","data":"{\"id\":\"30358154\",\"entityType\":0,\"sportOrder\":0,\"leag... |
| ❗ {"event":"Event","data":"{\"id\":\"30358154\",\"entityType\":0,\"sportOrder\":0,\"leag... |
| ❗ {"event":"Event","data":"{\"id\":\"30358154\",\"entityType\":0,\"sportOrder\":0,\"leag... |
| ❗ {"event":"Event","data":"{\"id\":\"30357853\",\"entityType\":0,\"sportOrder\":0,\"leag... |
| ❗ {"event":"Event","data":"{\"id\":\"30358154\",\"entityType\":0,\"sportOrder\":0,\"leag... |
| ❗ {"event":"Event","data":"{\"id\":\"30357853\",\"entityType\":0,\"sportOrder\":0,\"leag... |
| ❗ {"event":"Event","data":"{\"id\":\"30358154\",\"entityType\":0,\"sportOrder\":0,\"leag... |
| ❗ {"event":"Event","data":"{\"id\":\"30357853\",\"entityType\":0,\"sportOrder\":0,\"leag... |
| ❗ {"event":"Event","data":"{\"id\":\"30357853\",\"entityType\":0,\"sportOrder\":0,\"leag... |

Ex. 77.

287.    The following is a partial list of assets transmitted by DraftKings for a basketball game (Ex. 78):

```
1  {"event":"Event","data":"{\"id\":\"30357853\",\"entityType\":0,\"sportOrder\":0,\"leagueOrder\":0,
   \"isTopLeague\":false,\"participants\":[{\"id\":\"747\",\"name\":\"SAC
   Kings\",\"venueRole\":\"Away\"}],\"marketGroups\":[{\"id\":\"3624\",\"sortingKey\":0},{\"id\":
   \"3625\",\"sortingKey\":0},{\"id\":\"3626\",\"sortingKey\":0},{\"id\":\"3627\",\"sortingKey\":0,{
   \"id\":\"3628\",\"sortingKey\":0},{\"id\":\"3629\",\"sortingKey\":0},{\"id\":\"3630\",\"sortingKey
   \":0},{\"id\":\"3631\",\"sortingKey\":0},{\"id\":\"539\",\"sortingKey\":0},{\"id\":\"540\",\"sorti
   ngKey\":0},{\"id\":\"541\",\"sortingKey\":0},{\"id\":\"542\",\"sortingKey\":0}],\"totalMarketsCoun
   t\":157,\"marketLinesCount\":184,\"startEventDate\":\"2024-03-30T02:10:00.0000000Z\",\"status\":\"
   InProgress\",\"score\":{\"homeScore\":\"98\",\"awayScore\":\"101\",\"combinedSecondTierScores\":[\
   "26 : 34\",\"25 : 26\",\"22 : 22\",\"28 :
   16\"],\"additionalScores\":{\"basketballFirstQuarterScore1\":\"34\",\"basketballFirstQuarterScore2
   \":\"26\",\"basketballFourthQuarterScore1\":\"16\",\"basketballFourthQuarterScore2\":\"28\",\"bask
   etballOverTimeScore1\":\"0\",\"basketballOverTimeScore2\":\"0\",\"basketballSecondQuarterScore1\":
   \"26\",\"basketballSecondQuarterScore2\":\"25\",\"basketballThirdQuarterScore1\":\"22\",\"basketba
   llThirdQuarterScore2\":\"22\"}},\"isLive\":true,\"isGoingLive\":false,\"isTeamSwap\":true,\"liveGa
   meState\":{\"clockRunning\":true,\"clockDirection\":\"Timer\",\"gameTime\":205,\"gamePart\":\"Four
   thQuarter\"},\"isSuspended\":false}","channel":"prod-corsair-30357853"}
```

288.    This list of assets can be compared with a subsequent list. The example below shows screenshots from DraftKings Sportsbook and Casino relating to an MLB game between the Chicago Cubs and the Texas Rangers. These screenshots show that DraftKings is providing

updates with game statistics, such as score, batting information, inning information, and betting information.





(screenshot of the DraftKings Sportsbook app).

(screenshot of the DraftKings Sportsbook app with new pitch result and odds data).

289.    Comparing the two screenshots above, DraftKings updated the odds for the moneyline bet in response to the Texas Rangers' player, Josh Jung, making an out. DraftKings also updated the game statistics to reflect the first out in the 6th inning for the Rangers.





(screenshot of the DraftKings Sportsbook app).

(screenshot of the DraftKings Sportsbook app showing the receipt of new assets).

290.     Comparing the two screenshots above, DraftKings updated the score for the Texas Rangers after Adolis Garcia hit a home run.  Additionally, based on the additional information received by the '883 Accused Product, it locked out the user from placing bets on the result of the pitch to Adolis Garcia and subsequently provided betting options for the next batter, as shown below.



(screenshot from the DraftKings Sportsbook app).



291.    Comparing the screenshot above to the previous screenshot, DraftKings changed the inning from the bottom of the 6th to the top of the 7th to reflect the team at bat after the Texas Rangers player struck out, ending the inning.

292.    In the course of providing these updates, DraftKings transmits only assets that are not already resident on the customer's device.  The first list of assets can contain pre-game betting odds and the second list of assets can contain updated betting odds based on in-game events.  As another example, a first list of assets can contain previously-updated betting odds and a second list of assets can contain the odds that have changed based on in-game events.

293.    For example, with respect to the MLB game described above, the score, previously updated moneyline odds, and pitch results odds for the at bat player prior to the home run comprise a first list of assets.  After the home run, the game stats and odds will be outdated, so DraftKings sends a second list of assets that contains at least the updated score, moneyline odds, and pitch results odds for the new player at bat.  The above screen captures show the addition of a new asset received from DraftKings (pitch result odds for new player at bat) and the removal of former assets that are no longer needed (pitch result odds for the player who already hit the home run).

294.    Thus, DraftKings' '883 Accused Products satisfy all elements of exemplary Claim 20 of the '883 Patent.

295.    DraftKings' direct infringement of the '883 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

296.    The USPTO issued U.S. Patent Application No. 16/893,180 as the '883 Patent on September 20, 2022.  For the reasons discussed above in the Section entitled DraftKings' Knowledge of the Asserted Patents, DraftKings became aware of the '883 Patent and aware that its activities concerning the '883 Accused Products infringed the '883 Patent no later than upon its issuance on September 20, 2022.  At the very least, DraftKings became aware of its infringement of the '883 Patent from its receipt of this Complaint.

297.    DraftKings' pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '883 Patent.

298.    DraftKings' infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

299.    As discussed above, DraftKings acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '883 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' direct infringement of the '883 Patent.

## COUNT VIII
### (Indirect Infringement of U.S. Patent No. 11,451,883)

300.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

301.    As set forth above, DraftKings has had knowledge of its infringement of WinView's '883 Patent since at least as early as September 20, 2022 and has further knowledge of the '883 Accused Products' infringement of the '883 Patent from the filing of this Complaint.

302.    As set forth above, the '883 Accused Products directly infringe the '883 Patent. DraftKings has induced and continues to induce its customers' direct infringement of one or more claims of the '883 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '883 Patent by using the '883 Accused Products.

303.    DraftKings knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '883 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '883 Accused Products are used to gamble, they necessarily infringe the '883 Patent.  Therefore, DraftKings' encouragement

of its customers to use the '883 Accused Products to gamble necessarily encourages its customers to directly infringe the '883 Patent.

304.    As discussed in more detail above with respect to the '770 Patent, DraftKings encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '883 Accused Products, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '883 Accused Products in an infringing manner.

305.    All the elements of the claims of the '883 Patent are used by DraftKings and its customers, purchasers, users, developers, vendors, and manufacturers, or a combination thereof. As set forth above, DraftKings has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with DraftKings, one or more claims of the '883 Patent.

306.    DraftKings also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '883 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, DraftKings has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '883 Accused Products within the United States, without authority from WinView, it is providing the '883 Accused Products which are materials and apparatuses for practicing the claimed inventions of one or more claims of the '883 Patent.  The '883 Accused Products are material components of the systems infringing one or more claims of the'883 Patent.  The '883 Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses.  As discussed above, when the '883 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '883 Patent.

307.    DraftKings' indirect infringement of the '883 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

308.    DraftKings' indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

309.    DraftKings' indirect infringement of the '883 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

310.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' indirect infringement.

## COUNT IX
**(Direct Infringement of U.S. Patent No. 11,678,020)**

311.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

312.    In violation of 35 U.S.C. § 271(a), DraftKings directly infringed and continues to directly infringe the '020 Patent, including without limitation exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States DraftKings Sportsbook and Casino, DraftKings Casino, and DK Horse (the "'020 Accused Products").

313.    As set forth above in the Section entitled The Parties, Defendants DraftKings Inc., DK Crown Holding, Crown Gaming, SBTech US, and SBTech Global operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others. Thus, Defendants directly infringe by operating as a joint enterprise.

314. DraftKings' acts of making, using, importing, selling, and offering for sale the infringing '020 Accused Products have been without the permission, consent, authorization, or license of WinView. Indeed, DraftKings declined WinView's request that DraftKings partner with WinView.

315. DraftKings' infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

316. DraftKings owns and controls the operation of the '020 Accused Products and generates substantial financial revenues therefrom. DraftKings puts into service these products and directs and controls their operations as the licensed operator of these systems. To the extent portions of the '020 Accused Products are hosted on AWS servers, as discussed above, DraftKings controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '020 Accused Products in order to generate revenue.

317. To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

318. DraftKings also has directly infringed and continues to directly infringe the '020 Patent by having its employees test and use the '020 Accused Products in the United States. In order to maintain legal compliance, DraftKings is required to periodically monitor and ensure that the '020 Accused Products are performing as designed and intended. DraftKings further directly infringes by marketing and distributing the '020 Accused Products, which constitutes infringing offers to sell and sales.

319.    By way of example of DraftKings' infringement of the '020 Patent, the '020 Accused Products meet all of the limitations of exemplary Claim 1 of the '020 Patent, which recites:

> 1. A method of providing a game of skill or chance or other entertainment including content related to an event, the method comprising:
>
> a. determining a location of a mobile device;
>
> b. providing the game of skill or chance or other entertainment during the event, based on the location of the mobile device;
>
> c. receiving input related to the game of skill or chance or other entertainment during the event; and
>
> d. triggering a lockout signal to prevent users from submitting a response to the game of skill or chance or other entertainment, including utilizing a person in physical attendance at the event to determine when to trigger the lockout signal.

320.    The '020 Accused Products infringe the '020 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c).  For example, they perform the recited method of providing a game including content related to live events, as discussed below.

321.    DraftKings allows users to bet on sports matches, daily fantasy leagues, and casino game livestreams.  The '020 Accused Products involves games of chance.  *See, e.g.*, Ex. 13 at 17 ("The sports betting and iGaming industries are characterized by an element of chance."). DraftKings provides the DraftKings Sportsbook and Casino websites and the associated mobile applications.   The DraftKings Sportsbook and Casino offerings may be accessed online at sportsbook.draftkings.com and casino.draftkings.com respectively and by using the DraftKings Sportsbook and Casino Apps on mobile devices such as a smartphone, tablet, or computer.

322.    When customers attempt to use the '020 Accused Products, DraftKings determines the geographic location of the customers' mobile devices and uses that location data to determine the gaming options that are available to the customer.  DraftKings is required by law to determine

144

its customers' physical location, as customers must be located in a state that allows the game the customer seeks to play.  DraftKings uses GPS, Bluetooth, Wi-Fi location services to determine the location of customer devices.  *See, e.g.*, Ex. 27 (https://help.draftkings.com/hc/en-us/articles/4405236822931-Using-DraftKings-with-GeoComply-Location-Services-Overview-US).



Ex. 27 (https://help.draftkings.com/hc/en-us/articles/4405236822931-Using-DraftKings-with-GeoComply-Location-Services-Overview-US).

323.    DraftKings offers online sports betting in Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi (retail only), New Hampshire, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Vermont, Virginia, Washington (retail only), West Virginia, and Wyoming.  *See* Ex. 13 at F-8 (10-K).



Ex. 22 (Where is Online Sports Betting Legal?).  Similarly, DraftKings iGaming offering is available in Connecticut, Delaware, Michigan, New Jersey, Pennsylvania, Rhode Island and West Virginia.  *See* Ex. 13 at 60 (10-K).



Ex. 24 (Where is Online Gambling Legal?).

324.    DraftKings offers preliminary location-based requirements for the '020 Accused Products: physical presence in certain jurisdictions and requisite age per jurisdiction.  Ex. 22 (Where is sports betting legal?) (listing jurisdictions where sports betting is allowed); Ex. 24

(Where is online gambling legal?") ") (listing jurisdictions where online gambling is allowed); Ex. 79 (How old do I have to be to play on DraftKings) (listing required ages to use DraftKings Sportsbook by jurisdiction); Ex. 80 (Meet Our Regulators) (listing ages required to use DraftKings Casino by jurisdiction).

325.    DraftKings uses the location of its customers' mobile devices in order to provide appropriate games of chance.  The devices' location determines the set of DraftKings service related information to be loaded.  DraftKings provides users betting options that are legal for the specific jurisdiction.  DraftKings complies with state laws regarding online sports betting.  Ex. 81 (DraftKings Sportsbook College Team Betting Restrictions) ("DraftKings, along with other legal sportsbooks in the US, must comply with various state-specific rules pertaining to the betting markets they may offer."); Ex. 24 (Where is online gambling legal?) ("Once it's legalized in a state, casino operators like DraftKings Casino must meet regulations and licensing requirements specific to that state.  Therefore, DraftKings Casino in one state may have different offerings than it does in a different state.").

326.    With respect to DraftKings Sportsbooks, DraftKings offers different Sportsbook content between states.  For example, Louisiana does not have any restrictions on sports betting, while Connecticut has restrictions on "in-state collegiate teams."  Therefore, during a game where UConn is playing LSU at home in Connecticut, an individual physically located in Connecticut would not be able to bet on a UConn game, whereas an individual physically located in Louisiana could bet on the game.

327.    The '020 Accused Products make additional use of received location data to determine the game events available to customers and the corresponding data to the customers. Returning to the example of the UConn/LSU game, Arizona restricts prop betting on all collegiate

events.[1]  Thus, a customer physically located in Arizona is able to bet on the final outcome of the UConn/LSU game but is unable to bet on specific in-game propositions, such as which player will score the first basket.  DraftKings uses the location data for players to impose these location-specific restrictions on the wagers and data that may be accessed.

328.    The table below summaries DraftKings' state-specific betting restrictions with respect to college sports.



| State | In-state college teams offered | College team props | College player props | Heisman Winner |
|---|---|---|---|---|
| AZ | ✓ | ⊖ | ⊖ | ✓ |
| CO | ✓ | ✓ | ⊖ | ⊖ |
| CT | ⊖ | ✓ | ✓ | ⊖ |
| DC | ⊖ | ✓ | ✓ | ✓ |
| IL | ⊖ | ✓ | ✓ | ✓ |
| IN | ✓ | ✓ | ✓ · | ✓ |
| IA | ✓ | ✓ | ⊖ | ✓ |
| KS | ✓ | ✓ | ✓ | ✓ |
| KY | ✓ | ✓ | ✓ | ✓ |
| LA | ✓ | ✓ | ⊖ | ✓ |
| ME | ⊖ | ⊖ | ⊖ | ✓ |
| MD | ✓ | ✓ | ⊖ | ✓ |
| MA | ⊖ | ✓ | ⊖ | ⊖ |
| MI | ✓ | ✓ | ✓ | ✓ |
| NC | ✓ | ✓ | ✓ | ✓ |
| NH | ⊖ | ✓ | ✓ | ✓ |
| NJ | ⊖ | ✓ | ✓ | ✓ |
| NY | ⊖ | ✓ | ⊖ | ⊖ |
| OH | ✓ | ✓ | ⊖ | ✓ |
| OR | ⊖ | ⊖ | ⊖ | ⊖ |
| PA | ✓ | ✓ | ⊖ | ✓ |
| TN | ✓ | ✓ · | ⊖ | ✓ |
| VA | ⊖ | ✓ | ⊖ | ⊖ |
| VT | ⊖ | ✓ | ⊖ | ⊖ |
| WA | ⊖ | ✓ | ✓ | ⊖ |
| WV | ✓ | ✓ | ✓ | ✓ |
| WY | ✓ | ✓ | ✓ | ✓ |

Ex. 81 (DraftKings Sportsbooks College Betting Restrictions).

---

[1] A prop (or proposition) bet is a type of side wager on parts of a game or event that may have nothing to do with the final outcome.  Examples of popular prop bets range from picking the first player to record a basket in a game to the length of the national anthem at the Super Bowl.

329.    Similarly, with respect to DraftKings Casino, DraftKings offers different games depending on the location of the customer. *See* Ex. 24 (Where is online gambling legal?) ("Games legalized through the legislation include poker, slots, and other table games."); *id.* at 2 ("Games legalized through the legislation include slots, and other table games.")  For example, DraftKings' Electric Poker is only available in Michigan and Pennsylvania.  Ex. 82 (Where is DraftKings Electric Poker Available) ("At this time, to play DraftKings Electric Poker you must be physically located in Michigan or Pennsylvania.").   Thus, only customers located in Michigan or Pennsylvania will be provided with the opportunity to access Electric Poker and data related to that specific game.

**Where is DraftKings Electric Poker Available? (US)**

At this time, to play DraftKings Electric Poker you must be physically located in Michigan or Pennsylvania. Learn more about where DraftKings Casino is available.

Please note, Casino Credits can be used on select games, excluding Electric Poker.

*Id.*



(screen capture from DraftKings Casino app being operated in New Jersey (not showing data corresponding to the Electric Poker game).

330.    As another example, DraftKings Rocket offerings are different depending on the state, thus the information displayed and options available to players depends on the received customer location data.  Ex. 83 (DraftKings Rocket and Rocket 2 Overview) ("Multipliers may vary by jurisdiction.  The maximum amount players can bet may also vary by jurisdiction.").



*Id.*

331.    As discussed above, the list of available events and game information offered to customers changes based on the customers' locations.  DraftKings then receives input from the customers' devices related to the selected game of skill or chance or other entertainment during the event.  The input for the game of skill or change includes, for example, the submission of a bet.





(Screenshot of the DraftKings Sportsbooks app showing data input by the customer for a selected game that is allowed in the customer's location).

(Screenshot of DraftKings Casino app showing data input by the customer for a selected game that is allowed in the customer's location).

332.    DraftKings prevents customers from entering selections (such as placing a wager) by sending a lockout signal, utilizing a person in physical attendance at the event to determine when to trigger the lockout signal. *See, e.g.*, Powering Our Sportsbook Product (https://www.youtube.com/watch?v=qr5HR_vvSWw) at 9:45-10:46.

333.    DraftKings supplements its real-time data with data provided by SportRadar and BetGenius.  Ex. 13, DraftKings 10-K ("We rely on third-party sports data providers such as SportRadar and BetGenius to obtain accurate information regarding schedules, results, performance and outcomes of sporting events.").  Sportradar uses data scouts (or data journalists) that are physically present at games to send event data to its servers.  *See* Sportradar's Live Scouting Data Journalists in Action (https://www.youtube.com/watch?app=desktop&v=5WGY-Vu9ZZg) (Sportradar data scout explaining that while watching the game at the venue he "use[s]

151

specialty software to record every event that happens. . . . As soon as [he] see[s] it happen [he] press[es] the button [on the software]. [He] enter[s] it into the system and it goes live].); *see also*, Ex. 53, Baseball API Documentation ("Data is collected via Sportradar on-venue scouts and in-house operators."); Ex. 54, Basketball API Documentation (same); Ex. 55, Football API Documentation (same); Ex. 56, Hockey API Documentation (same); Ex. 57, Soccer API Documentation (same). DraftKings uses this data to trigger the lockout signal.

334.    With respect to DraftKings Sportsbook, the betting procedure works as a "shopping cart." Customers can place bets before or during the game. If a bet becomes unavailable, customers will receive a lockout signal: the odds offering will convert from an active betting option (such as the "Konrad Kulpa – 600" moneyline bet below) into a greyed-out lock symbol (such as the "Game 1 Point Winner" bet below), meaning that customers can no longer add this selection to their bet slips.



335.    If the locked-out bet is already in the cart, the user will receive a notification that the bet is closed.   The screenshots below illustrate a cart before and after DraftKings sends a lockout signal.




(screenshot of a DraftKings Sportsbook app)     (screenshot of the DraftKings Sportsbook app)

336.    Similarly, with respect to DraftKings Casino, customers receive lockout signals indicating that they are locked out from submitting any additional bet submissions.   Thus, DraftKings' '020 Accused Products satisfy all elements of exemplary Claim 1 of the '020 Patent.

337.    DraftKings' direct infringement of the '020 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

338.    The USPTO issued U.S. Patent Application No. 17/531,596 as the '020 Patent on June 13, 2023.  For the reasons discussed above in the Section entitled DraftKings' Knowledge of

154

the Asserted Patents, DraftKings became aware of the '020 Patent and aware that its activities

concerning the '020 Accused Products infringed the '020 Patent no later than upon its issuance.

At the very least, DraftKings became aware of its infringement of the '020 Patent from its receipt

of this Complaint. DraftKings' pre-suit infringement and ongoing infringement since the filing of

this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '020

Patent.

339.    DraftKings' infringement has caused and is continuing to cause damage and

irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury

unless and until that infringement is enjoined by this Court.

340.    As discussed above, DraftKings acted recklessly, willfully, and wantonly, and

deliberately engaged in acts of infringement of the '020 Patent, justifying an award to WinView

of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35

U.S.C. § 285. WinView is further entitled to injunctive relief, damages and any other relief in

accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' direct infringement of the '020

Patent.

## <u>COUNT X</u>
### (Indirect Infringement of U.S. Patent No. 11,678,020)

341.    WinView repeats, realleges, and incorporates herein by reference, as if fully set

forth herein, the allegations of the preceding paragraphs, as set forth above.

342.    As set forth above, DraftKings has had knowledge of its infringement of

WinView's '020 Patent since at least as early as June 13, 2023 and has further knowledge of the

'020 Accused Products' infringement of the '020 Patent from the filing of this Complaint.

343.    As set forth above, the '020 Accused Products directly infringe the '020 Patent.

DraftKings has induced and continues to induce its customers' direct infringement of one or more

claims of the '020 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '020 Patent by using the '020 Accused Products.

344.    DraftKings knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '020 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '020 Accused Products are used to gamble, they necessarily infringe the '020 Patent.  Therefore, DraftKings' encouragement of its customers to use the '020 Accused Products to gamble necessarily encourages its customers to directly infringe the '020 Patent.

345.    As discussed in more detail above with respect to the '770 Patent, DraftKings encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '020 Accused Products, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '020 Accused Products in an infringing manner.

346.    All the elements of the claims of the '020 Patent are used by DraftKings and its customers, purchasers, users, developers, vendors, and manufacturers, or a combination thereof. As set forth above, DraftKings has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with DraftKings, one or more claims of the '020 Patent.

347.    DraftKings also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '020 Patent pursuant to 35 U.S.C. § 271(c).

As discussed above, DraftKings has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '020 Accused Products within the United States, without authority from WinView, it is providing the '020 Accused Products which are materials and apparatuses for practicing the claimed inventions of one or more claims of the '020 Patent. The '020 Accused Products are material components of the systems infringing one or more claims of the '020 Patent. The '020 Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses. As discussed above, when the '020 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '020 Patent.

348.    DraftKings' indirect infringement of the '020 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

349.    DraftKings' indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

350.    DraftKings' indirect infringement of the '020 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

351.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' indirect infringement.

## COUNT XI
### (Direct Infringement of U.S. Patent No. 11,736,771)

352.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

353.    In violation of 35 U.S.C. § 271(a), DraftKings directly infringed and continues to directly infringe the '771 Patent, including without limitation exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States DraftKings Sportsbook and Casino, DraftKings Casino, and DK Horse (the "'771 Accused Products").

354.    As set forth above in the Section entitled The Parties, Defendants DraftKings Inc., DK Crown Holding, Crown Gaming, SBTech US, and SBTech Global operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

355.    DraftKings' acts of making, using, importing, selling, and offering for sale the infringing '771 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, DraftKings declined WinView's request that DraftKings partner with WinView.

356.    DraftKings' infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents

357.    DraftKings own and control the operation of the '771 Accused Products and generates substantial financial revenues therefrom.  DraftKings puts into service this product and directs and controls its operation as the licensed operator of this system.  To the extent portions of the '771 Accused Products are hosted on AWS servers, as discussed above, DraftKings controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '771 Accused Products in order to generate revenue.

358.    To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

359.    DraftKings also has directly infringed and continues to directly infringe the '771 Patent by having its employees test and use the '771 Accused Products in the United States.  In order to maintain legal compliance, DraftKings is required to periodically monitor and ensure that the '771 Accused Products are performing as designed and intended.  DraftKings further directly infringes by marketing and distributing the '771 Accused Products, which constitutes infringing offers to sell and sales.

360.    By way of example of DraftKings' infringement of the '771 Patent, the '771 Accused Products meet all of the limitations of exemplary Claim 1 of the '771 Patent, which recites:

> 1. A server comprising:
>
>    a. a memory for storing an application for conducting one or more real-time games of skill or chance or other entertainment in connection with a sports event, the application configured for:
>
>       i. communicating with a plurality of devices grouped into a plurality of cohorts, wherein each cohort constitutes participants in one of the real-time games of skill or chance or other entertainment; and
>
>       ii. storing one or more files related to the one or more real-time games of skill or chance or other entertainment;
>
>       iii. simultaneously transmitting the one or more files to each of the devices within a cohort;

iv. sending one or more lockout signals at one or more appropriate times based on an amount of delay to prevent users from submitting one or more responses to the one or more real time games of skill or chance or other entertainment, wherein the at least one of the one or more lockout signals is based on information from an observer of the sports event; and

b. a processor for processing the application.

361.    The '771 Accused Products infringe the '771 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c), as discussed below.  For example, they are the software that is placed on servers to conduct real-time games in connection with sports events.

362.    DraftKings operates servers within each jurisdiction in which it offers the '771 Accused Products, as states generally require that DraftKings' servers be located within their boundaries in order to operate.  *See, e.g.*, N.Y. PML § 1367-A(h)-(i) ("The server or other equipment which is used by a mobile sports wagering licensee to accept mobile sports wagering shall be physically located in the licensed gaming facility"); N.J.S.A §§ 5:12A-11(a); 5:20-2(c) ("all equipment used by the holder of the permit, including computers and servers, to conduct fantasy sports activities shall be physically located within the boundaries of" "a restricted area on the premises of the casino hotel or in another facility owned or leased by the casino licensee . . . that is secure, inaccessible to the public"); N.J.S.A § 5:12-95.22; 68 IAC 27-6-2 ("A sports wagering operator must locate a server in the state of Indiana.").  These servers communicate with customers' devices, which allow users to operate the '020 Accused Products on the devices (e.g., mobile phone, tablets, and laptops).

363.    In addition to its own servers, DraftKings use cloud-hosted services to support the operation of the '771 Accused Products.  Specifically, DraftKings uses AWS' Lambda function as a service.  Reviewing the network traffic of an Accused Product illustrates DraftKings' use of AWS' S3 (object storage system) and CloudFront (content delivery network) services which

implement with Lambda.  *See* Ex. 47 (DraftKings' technology profile illustrating it uses AWS services such as CloudFront S3).



| ▼ General | |
| --- | --- |
| Request URL: | https://www.draftkin |
| Request Method: | GET |
| Status Code: | ● 200 OK |
| Remote Address: | [2600:1406:3a00:a: |
| Referrer Policy: | strict-origin-when-c |

| ▼ Response Headers | |
| --- | --- |
| Accept-Ranges: | bytes |
| Access-Control-Allow-Credentials: | true |
| Access-Control-Allow-Origin: | * |
| Access-Control-Expose-Headers: | Date,ETag,calculatio |
| Cache-Control: | public, max-age=43 |
| Content-Length: | 51708 |
| Content-Type: | application/octet-str |
| Date: | Fri, 25 Oct 2024 05: |
| Etag: | "515a8af481f298b6 |
| Last-Modified: | Tue, 08 Oct 2024 17 |
| Strict-Transport-Security: | max-age=2628000 ; |
| X-Amz-Id-2: | 3f13S+8Il0+wvLE8S |
| X-Amz-Request-Id: | E6MPAQ79M3SXH9 |
| X-Amz-Server-Side-Encryption: | AES256 |
| X-Content-Type-Options: | nosniff |
| X-Frame-Options: | SAMEORIGIN |

| ▼ General | |
| --- | --- |
| Request URL: | https://d2tjpz01y5bfgl |
| Request Method: | GET |
| Status Code: | ● 200 OK (from disk |
| Remote Address: | 52.222.231.20:443 |
| Referrer Policy: | strict-origin-when-cro |

| ▼ Response Headers | |
| --- | --- |
| Accept-Ranges: | bytes |
| Age: | 44916 |
| Content-Length: | 7691 |
| Content-Type: | image/png |
| Date: | Thu, 24 Oct 2024 16: |
| Etag: | "b06aa4c1d2fc7815c( |
| Last-Modified: | Mon, 14 May 2018 15: |
| Server: | AmazonS3 |
| Via: | 1.1 6ecf574c848f26ft |
| X-Amz-Cf-Id: | k32I9FMf50uqqiVifpe |
| X-Amz-Cf-Pop: | SFO5-C3 |
| X-Cache: | Hit from cloudfront |

(screenshot of DraftKings' network traffic with X-Amz-Id-2 in the response header); *see also* Ex. 45 (listing X-Amz-Id-2 as an AWS response header).

(screenshot of DraftKings' network traffic with X-Amz-Cf-Id in the response header); *see also* Ex. 46 (listing X-Amz-Cf-Id as an AWS response header).

364.    DraftKings' SEC filings further confirm its use of AWS services.   Ex. 13 (DraftKings 10-K) ("[DraftKings] rel[ies] on Amazon Web Services to deliver [its] product offerings to users," and "[it] host[s] certain of [its] product offerings and support [its] operations using Amazon Web Services ("AWS"), a third-party provider of cloud infrastructure services, along with other service providers.").

365.    DraftKings has direction and control over AWS' servers via its services.   As discussed above, the AWS' Customer Agreement provides that DraftKings is responsible for its content, proper configuration and use of AWS services, its end users compliance with DraftKings

agreement with AWS, acknowledging that AWS does not provide support and services to the end users.  Ex. 48 (AWS Customer Agreement).

366.    Additionally, AWS' data privacy terms specify that "[DraftKings] maintain[s] full control of [its] content that [it] uploads to the AWS services . . . , and [is] responsib[le] for configuring access to AWS services and resources. . . . [DraftKings] configure[s] access control permissions for any of the services [it] develop[s] or deploy[s] in an AWS environment.  [AWS] do not access or use [DraftKings'] content for any purpose without [its] agreement."  Ex. 49 (Data Privacy FAQs).

367.    DraftKings' servers have memory that stores the software used to operate the '771 Accused Product.  DraftKings then uses the software to allow users to bet on sports matches.  *See* Ex. 13 (DraftKings 10-K) at 3 ("We provide users with online sports betting ("Sportsbook"), online casino ("iGaming") and daily fantasy sports ("DFS") product offerings, as well as retail sportsbook, media and other consumer product offerings.").

368.    DraftKings Sportsbook is an entertainment service that enables users to conduct sports betting in real-time.  *Id.* at 3 ("We are a digital sports entertainment and gaming company [that] provide[s] users with online sports betting ('Sportsbook')").  Sports betting is characterized as a game of chance.  Ex. 13 at 17 (DraftKings 10-K) ("The sports betting and iGaming industries are characterized by an element of chance"); Ex. 29 (Live Betting – How to Bet 101) ("Live betting allows you to bet in real-time while the action is unfolding.").  A user places bets in DraftKings Sportsbook based on televised sports events (e.g., NFL games).  Ex. 60 (Ways to Watch).

369.    Each live event for which in-game betting is made available is a real-time game of chance and a separate cohort.  Ex. 64 (Apache Kafka as a centralized state management platform — Part 1) ("When a consumer registers to a topic, it provides the Kafka broker with a key called

'consumer group' that will identify the group this specific consumer is part of.  Multiple consumers sharing the same group will distribute the consumption of the topic, sharing the partitions between them.").

370.    Further, each participant in the cohort communicates independently with DraftKings' servers, as shown below.



Ex. 63 (Apache Kafka as a centralized state management platform — Part 2).

371.    The screenshot below illustrates three basketball-related game cohorts available for a user to join: (1) the Mavericks v. Kings game cohort, (2) the Creighton v. Tennessee game cohort, and (3) the Duke v. Houston game cohort.



(screenshot of the DraftKings Sportsbook).  When a player is engaged in live betting for a game, the player has joined the cohort for that game.  For example, the screenshot below shows that the user has joined the Mavericks v. Kings game cohort.



(screenshot of the DraftKings Sportsbook app).

372.    DraftKings can store various files related to the game that are the subject of the cohort, including historical game data, user bets, and bet results.  For example, the screenshot below confirms that a user's bets are sent to and retrieved from DraftKings' servers.





(screenshot of DraftKings Sportsbook App showing bet being submitted by a user being sent to DraftKings' servers).

(screenshot of DraftKings Sportsbooks App showing a user pulling current bets for a game from DraftKings' servers).

373.    A user can also retrieve the active bets from a device different from the device used to place the bet, confirming the bets are saved to DraftKings' server and not just locally stored on the device.



(screenshot of the DraftKings Sportsbook website showing access to stored bet data).

374.    DraftKings' servers send simultaneous real-time updates of games players have displayed on their devices.  These updates are simultaneously transmitted in order to provide each user with the most up-to-date data as close to real-time as possible.  As shown in the diagram below, the data contained in the Event Stream Topic (game data) are sent to the Event Stream Topic Single consumer group (cohort) where Ledger Topic consumer groups A-C (individual users) receive the data.



Ex. 63 (Apache Kafka as a centralized state management platform — Part 2).

375.    DraftKings sends lockout signals to its customers' apps and computers in order to prevent untimely entry of wagers.  DraftKings may modulate the amount of delay, if any, based on the latency of a user's device.

169

376.    DraftKings Sportsbook betting works as a "shopping cart."  Players can place bets before or during the game.  Once DraftKings sends a lockout signal for a bet, the bet become unavailable.  The offered odds will turn into a greyed-out lock symbol and customers will no longer be able to add this selection to their bet slip, and the user will receive a notification that the bet is closed.

377.    DraftKings utilizes a person physically attending the events to determine when to trigger the lockout signal.    *See,  e.g.*,  Powering Our Sportsbook Product (https://www.youtube.com/watch?v=qr5HR_vvSWw) at 9:45-10:46.  DraftKings supplements its real-time data with data provided by SportRadar and BetGenius. Ex. 13, DraftKings 10-K ("We rely on third-party sports data providers such as SportRadar and BetGenius to obtain accurate information regarding schedules, results, performance and outcomes of sporting events."). Sportradar uses data scouts (or data journalists) that are physically present at games to send event data to its servers.    *See*  Sportradar's Live Scouting Data Journalists in Action (https://www.youtube.com/watch?app=desktop&v=5WGY-Vu9ZZg)  (Sportradar data scout explaining that while watching the game at the venue he "use[s] specialty software to record every event that happens. . . . As soon as [he] see[s] it happen [he] press[es] the button [on the software]. [He] enter[s] it into the system and it goes live].); *see also*, Ex. 53, Baseball API Documentation ("Data is collected via Sportradar on-venue scouts and in-house operators."); Ex. 54, Basketball API Documentation (same); Ex. 55, Football API Documentation (same); Ex. 56, Hockey API Documentation (same); Ex. 57, Soccer API Documentation (same). DraftKings uses this data to trigger the lockout signal.

378.    Below are screenshots of DraftKings' Sportsbooks App, showing a cart before and after a bet is closed.

 

(screenshot of DraftKings Sportsbook App showing a cart before a bet is closed).

(screenshot of DraftKings Sportsbooks App showing a cart after a bet is closed).

379.    DraftKings' servers have processors to run the software that powers their software providing the '771 Accused Product.

380.    Thus, DraftKings' '771 Accused Products satisfy all elements of exemplary Claim 53 of the '771 Patent.

381.    DraftKings' direct infringement of the '771 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

382.    The USPTO issued U.S. Patent Application No. 17/387,055 as the '771 Patent on August 22, 2023.  For the reasons discussed above in the Section entitled DraftKings' Knowledge of the Asserted Patents, DraftKings became aware of the '771 Patent and aware that its activities concerning the '771 Accused Product infringed the '771 Patent no later than upon its issuance on August 22, 2023.  At the very least, DraftKings became aware of its infringement of the '771 Patent from its receipt of this Complaint.  DraftKings' pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '771 Patent.

383.    DraftKings' infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

384.    As discussed above, DraftKings acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '771 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' direct infringement of the '771 Patent.

### COUNT XII
### (Indirect Infringement of U.S. Patent No. 11,736,771)

385.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

386.    As set forth above, DraftKings has had knowledge of WinView's patents and of its infringement of the '771 Patent since at least as early as August 22, 2023 and has further

knowledge of the '883 Accused Products' infringement of the '883 Patent from the filing of this Complaint.

387.    As set forth above, the '771 Accused Product directly infringes the '771 Patent. DraftKings has induced and continues to induce its customers' direct infringement of one or more claims of the '771 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '771 Patent by using the '771 Accused Product.

388.    DraftKings knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '771 Accused Product, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '771 Accused Product is used to gamble, it necessarily infringes the '771 Patent.  Therefore, DraftKings' encouragement of its customers to use the '771 Accused Product to gamble necessarily encourages its customers to directly infringe the '771 Patent.

389.    As discussed in more detail above with respect to the '770 Patent, DraftKings encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '771 Accused Product, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '771 Accused Product in an infringing manner.

390.    All the elements of the claims of the '771 Patent are used by DraftKings and its customers, purchasers, users, developers, vendors, and manufacturers, or a combination thereof. As set forth above, DraftKings has known or has been willfully blind to the fact that it is inducing

others to infringe by practicing, either themselves or in conjunction with DraftKings, one or more claims of the '771 Patent.

391.   DraftKings also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '771 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, DraftKings has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '771 Accused Product within the United States, without authority from WinView, it is providing the '771 Accused Product which is a material component of the systems infringing one or more claims of the '771 Patent.  The '771 Accused Product is not a staple article or commodity of commerce suitable for substantial non-infringing uses.  As discussed above, when the '771 Accused Product is used to gamble, which is its only substantial intended function, it infringes the '771 Patent.

392.   DraftKings' indirect infringement of the '771 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

393.   DraftKings' indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

394.   DraftKings' indirect infringement of the '771 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

395.   WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' indirect infringement.

## COUNT XIII
### (Direct Infringement of U.S. Patent No. 11,918,880)

396.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

397.    In violation of 35 U.S.C. § 271(a), DraftKings directly infringed and continues to directly infringe the '880 Patent, including without limitation at least exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States DraftKings Fantasy Sports and DraftKings Pick6: Fantasy Game (the "'880 Accused Products").

398.    While the '880 Patent includes both method claims and non-method claims, WinView is only asserting the method claims of the '880 Patent and is not asserting any non-method claims of the '880 Patent.  The marking requirement of 35 U.S.C. § 287(a), therefore, does not apply to WinView's request for pre-suit damages for the '880 Patent because WinView is only asserting method claims from the '880 Patent.

399.    As set forth above in the Section entitled The Parties, Defendants DraftKings Inc., DK Crown Holding, Crown Gaming, SBTech US, and SBTech Global operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

400.    DraftKings' acts of making, using, importing, selling, and offering for sale the infringing '880 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, DraftKings declined WinView's request that that DraftKings partner with WinView.

401.    DraftKings' infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

402.    DraftKings own and control the operation of the '880 Accused Products and generates substantial financial revenues therefrom.

403.    DraftKings puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '880 Accused Products are hosted on AWS servers, as discussed above, DraftKings controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '880 Accused Products in order to generate revenue.

404.    To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

405.    DraftKings also has directly infringed and continues to directly infringe the '880 Patent by having its employees test and use the '880 Accused Products in the United States.  In order to maintain legal compliance, DraftKings is required to periodically monitor and ensure that the '880 Accused Products are performing as designed and intended.  DraftKings further directly infringes by marketing and distributing the '880 Accused Products, which constitutes infringing offers to sell and sales.

406.    By way of example of DraftKings' infringement of the '880 Patent, the '880 Accused Products meet all of the limitations of exemplary Claim 1 of the '880 Patent, which recites:

> 1. A method programmed in a server device, the method comprising:
>
> a. determining a user's physical location and the user's eligibility to participate in a set of competitive participant groups based on the user's physical location;
>
> b. providing to a user device from the server device the set of competitive participant groups to join;

c. receiving user input including a selection of a plurality of competitive participant groups to join, wherein the plurality of competitive participant groups correspond to one or more events;

d. receiving additional user input including a set of event selections related to the one or more events, wherein the set of event selections comprises predictions available before the one or more events of occurrences happening during the one or more events and enables simultaneously participating with the plurality of competitive participant groups; and

e. triggering a lockout signal at the server device to prevent further additional user input.

407.    The '880 Accused Products infringe the '880 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c).  For example, they are the software that performs the claimed method for implementing competitive groups for events, as discussed below.

408.    The '880 Accused Products are provided by DraftKings from servers.  Ex. 13 at 19 ("We host certain of our product offerings and support our operations using Amazon Web Services ('AWS'), a third-party provider of cloud infrastructure services, along with other service providers").  As discussed above, DraftKings is using AWS' Lambda function as a service. Reviewing the network traffic illustrates DraftKings' use of AWS' S3 (object storage system) and CloudFront (content delivery network) services.  DraftKings' use of AWS and it supporting operation for DraftKings Daily Fantasy is at the direction and control of DraftKings.

409.    As discussed above, DraftKings' determines the physical location of its customers and if they are eligible to play various games offered by the '880 Accused Products based on their location.  In addition to location-based restrictions, Daily Fantasy provides offerings based on a user's time on the platform, skill, and participation level.  For example, Daily Fantasy offers "Beginner Contests" which are available to players who have participated in fewer than 50 contests and have not earned an experience badge, allowing new users to compete against other beginners and avoid more skilled "sharks" who might otherwise dominate contests.  Similarly, DraftKings

offers "Casual Contests" which are intended for players who have played over 50 contests but have

not yet earned an experience badge, offering a space where intermediate players can continue to

improve without facing highly skilled veterans.  Exs. 66, 67, 68.



Ex. 66 (Screenshot of exemplary Beginner Contest from DraftKings' website).

410.    The '880 Accused Products provide customers with a list of the games (competitive

participant groups) they are permitted to join related to a sports event prior to the beginning of the

event.  The customers' entry into such a contest is a user selection.  In the below screenshot on the

left, a user is presented with six different contests they are eligible to enter in.  These six contests

pertain to nine different games that begin as early as 4 PM PDT, as shown in the below screenshot

on the right.  When a customer enters multiple contests, the customer participates in the contests

simultaneously because they relate to the same set of games..




(screenshot showing six of the contests that a customer is eligible to participate in).

(screenshot showing the 9 games that are part of the contests).

411.    Reviewing a specific contest (NBA $80K Fadeaway) confirms that the selections are made prior to the commencement of the first game (Starts 4:30 PDT, with 15 hours, 20 minutes, and 24 seconds left on the timer).



(screenshot of the lineup selection screen)

412.    The screenshots below of the DraftKings Daily Fantasy App show a user can create a lineup to join a competitive participant group that they can use in different contests to join.






(screenshot of the DraftKings Daily Fantasy App showing examples of the different contests a user can join for a given sport and time slot).

(screenshot of the DraftKings Daily Fantasy App showing a user can create a line up to enter into contests).



(screenshot of the DraftKings Daily Fantasy App showing a user can enter the lineup into other contests).



(screenshot of the DraftKings Daily Fantasy App showing a user can enter the same contest with a different lineup).



(screenshot of the DraftKings Daily Fantasy App showing a user can enter a different contest with a different lineup).

413.    Similarly, the screenshots below of the DraftKings Pick 6 App show a user can create a lineup to join a competitive participant group that they can use in different contests to join.





(screenshot of the DraftKings Pick 6 App showing a user can create a line for entry into a contest).

(screenshot of the DraftKings Pick 6 App showing a user can enter the lineup into multiple contests).





(screenshot of the DraftKings Pick 6 App showing the current lineup and allowing a user to "Play For More").

(screenshot of the DraftKings Pick 6 App showing a user can enter additional contest with the same line up by increasing their entry fee).





(screenshot of the DraftKings Pick 6 App showing a non-exhaustive list of the additional contests made available to the user with the increase in entry fee).

(screenshot of the DraftKings Pick 6 App showing a user can create another line to enter other contests).

414.    DraftKings' DFS and Pick 6 services are configured for receiving user input including a group selection of the plurality of competitive groups available to join, wherein each group of the plurality of competitive groups participates in a separate competition.  DraftKings allows users to choose a league, team, lineup and place bets.  For example, DraftKings Daily Fantasy allows users to create one or more lineups and enter the lineups into multiple contests.  Each line up can be entered into a different competition.  Below are screenshots of DraftKings'

Daily Fantasy Application (in the example, on an Apple device) showing that DraftKings Daily Fantasy allows a user to compete in distinct contests for each line up. In the screenshot below, the user entered the "NBA $2 Double Up" and "NBA $20K And-One" contests with different line ups. These contests will occur simultaneously and begin "TODAY AT 4:30 PM PST."



(screenshot from the DraftKings Daily Fantasy app). Similarly, with respect to Pick6, a user can enter two different contests with different line up. This is confirmed by the different contest IDs.





(screenshots of the DraftKings Pick6 app).



(screenshot of DraftKings Daily Fantasy App showing a user can create a lineup to enter into contests).



(screenshot of DraftKings Daily Fantasy App showing a user can enter the lineup into other contests).

 

(screenshot of DraftKings Daily Fantasy App showing a user can enter the same contest with a different lineup).

(screenshot of DraftKings Daily Fantasy App showing a user can enter a different contest with a different lineup).

415.    Similarly, below are screenshots of DraftKings' Pick6 Application showing that a user can create a lineup to join a competitive group, that can be used in different contests.



(screenshot of DraftKings Pick6 App showing a user can create a lineup for entry into a contest).



(screenshot of DraftKings Pick6 App showing a user can enter the lineup into multiple contests).







(screenshot of DraftKings Pick6 App showing the current lineup and allowing a user to "Play For More.").

(screenshot of DraftKings Pick6 App showing that users can enter into additional contests with the same lineup by increasing their entry fee).



(screenshot of DraftKings Pick6 App showing a non-exhaustive list of the additional contests made available to the user with the increase in entry fee).

(screenshot of DraftKings Pick6 App showing a user can create another lineup to enter other contests.).

416.    DraftKings uses lockout signals to prevent customers from entering untimely wagers (additional user input).  For example, in the Pick6 App, if a user fails to finalize a contest entry prior to the triggering of the lockout signal, the app will not allow a new submission and the user will receive an error message.



(screenshot of showing an error message
after the customer attempts to submit a
lineup after the lockout).

417.    Thus, DraftKings' '880 Accused Products satisfy all elements of exemplary Claim
1 of the '880 Patent.

418.    DraftKings' direct infringement of the '880 Patent has injured and continues to
injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

419.    The USPTO issued U.S. Patent Application No. 17/688,412 as the '880 Patent on
March 5, 2024.  For the reasons discussed above in the Section entitled DraftKings' Knowledge
of the Asserted Patents, DraftKings became aware of the '880 Patent and aware that its activities
concerning the '880 Accused Products infringed the '880 Patent no later than upon its issuance on

March 5, 2024.  At the very least, DraftKings became aware of its infringement of the '880 Patent from its receipt of this Complaint.

420.    DraftKings' pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '880 Patent.

421.    DraftKings' infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

422.    As discussed above, DraftKings acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '880 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' direct infringement of the '880 Patent.

## <u>COUNT XIV</u>
### (Indirect Infringement of U.S. Patent No. 11,918,880)

423.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

424.    As set forth above, DraftKings has had knowledge of its infringement of WinView's '880 Patent since at least as early as March 5, 2024 and has further knowledge of the '880 Accused Products' infringement of the '880 Patent from the filing of this Complaint.

425.    As set forth above, DraftKings' customers directly infringe the '880 Patent when they use the '880 Accused Products.  DraftKings has induced and continues to induce its customers' and end users' direct infringement of one or more claims of the '880 Patent under 35

U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring, and guiding its customers and end users to directly infringe one or more claims of the '880 Patent.

426.    For example, DraftKings knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the Accused Products.

427.    DraftKings engages in such encouragement by providing new and existing customer promotions and incentives, instructions, guidance regarding the use and troubleshooting, how to and strategy guides, videos, and tutorials, which direct and indirectly facility the use of the Accused Products.

428.    As discussed in more detail above with respect to the '770 Patent, DraftKings encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '880 Accused Product, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '880 Accused Product in an infringing manner.

429.    All the elements of the claims are used by either DraftKings, their customers, purchasers, users, developers, vendors, and manufacturers, or some combination thereof. DraftKings has known or has been willfully blind to the fact that they are is inducing others to infringe by practicing, either themselves or in conjunction with DraftKings, one or more claims of the '880 Patent.

430.    DraftKings has also contributorily infringed and continue to contributorily infringe one or more claims of the '880 Patent pursuant to of 35 U.S.C. § 271(c), and with knowledge or willful blindness by selling and offering to sell within the United States the '880 Accused Products,

without authority, which constitute materials and apparatuses for practicing the claimed invention of one or more claims of the '880 Patent, such materials and apparatuses constituting material components of the inventions of the '880 Patent and not staple articles or commodities of commerce suitable for substantial non-infringing uses. For example, WinView is informed and believes, and on that basis alleges, that DraftKings has knowledge that the DraftKings Daily Fantasy and Pick6 websites and mobile applications constitute material parts of the inventions of the '880 Patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are used in an infringing manner. In particular, DraftKings know that their products are particularly suited to be used in an infringing manner.

431. To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

432. DraftKings' indirect infringement of the '880 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

433. DraftKings' indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

434. DraftKings' indirect infringement of the '880 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.

435. WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' indirect infringement.

## COUNT XV
### (Direct Infringement of U.S. Patent No. 11,951,402)

436.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

437.    In violation of 35 U.S.C. § 271(a), DraftKings directly infringed and continues to directly infringe the '402 Patent, including without limitation exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States DraftKings Fantasy Sports and DraftKings Pick6: Fantasy Game (the "'402 Accused Products").

438.    While the '402 Patent includes both method claims and non-method claims, WinView is only asserting the method claims of the '402 Patent and is not asserting any non-method claims of the '402 Patent.  The marking requirement of 35 U.S.C. § 287(a), therefore, does not apply to WinView's request for pre-suit damages for the '402 Patent because WinView is only asserting method claims from the '402 Patent.

439.    As set forth above in the Section entitled The Parties, Defendants DraftKings Inc., DK Crown Holding, Crown Gaming, SBTech US, and SBTech Global operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

440.    DraftKings' acts of making, using, importing, selling, and offering for sale the infringing '402 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, DraftKings declined WinView's request that DraftKings partner with WinView.

441.    DraftKings' infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

442.    DraftKings owns and controls the operation of its '402 Accused Products and generates substantial financial revenues therefrom. DraftKings puts into service these products and directs and controls their operations as the licensed operator of these systems. To the extent portions of the '402 Accused Products are hosted on AWS servers, as discussed above, DraftKings controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '402 Accused Products in order to generate revenue.

443.    To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

444.    DraftKings also has directly infringed and continues to directly infringe the '402 Patent by having its employees test and use the '402 Accused Products in the United States. In order to maintain legal compliance, DraftKings is required to periodically monitor and ensure that the '402 Accused Products are performing as designed and intended. DraftKings further directly infringes by marketing and distributing the '402 Accused Products, which constitutes infringing offers to sell and sales.

445.    By way of example of DraftKings' infringement of the '402 Patent, the '402 Accused Products meet all of the limitations of exemplary Claim 1 of the '402 Patent, which recites:

> 1. A method, programmed in a memory of a device, of participating in a plurality of competitive groups, each comprising a plurality of competitors and corresponding to one or more events, the method comprising:
>
> determining, with the device, a physical location of a user and eligibility of the user to participate in the plurality of competitive groups based on the physical location of the user;

receiving, with the device, one or more event selections by the user related to the one or more events prior to the beginning of a first event of the one or more events, wherein the one or more event selections enable the user to participate in the plurality of competitive groups; and

triggering, on the device, a lockout signal preventing further additional user input.

446.    The '402 Accused Products infringe the '402 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c).  For example, they are the software programmed in the memory of computer devices to operate competitive groups corresponding to live events, as discussed below.

447.    DraftKings' Daily Fantasy and Pick6 offerings are software that reside in the memory of a computing device and allow DraftKings' customers to participate in competitive groups corresponding to sporting events.  The '402 Accused Products can be accessed via mobile applications downloaded on a user's smartphone, tablet, or computer.  Below are screenshots of DraftKings' Daily Fantasy and Pick6 mobile apps, on the Apple App Store.





(screenshot of DraftKings Pick6 App on Apple App Store).

(screenshot of DraftKings Daily Fantasy App on Apple App Store).

448.    Alternatively, DraftKings' Daily Fantasy and Pick6 can be accessed via websites on users' smartphones, tablets, and computers.  Below is a screenshot of DraftKings' Daily Fantasy and Pick6 websites.



(screenshot of DraftKings' Daily Fantasy website).



(screenshot of DraftKings' Pick6 website).

449.    As discussed above, DraftKings Daily Fantasy and Pick6 run on devices, including Apple iOS and iPadOS, Android phones and tablets, and personal computers and are software that is stored in the memory of those devices.

450.    As discussed in detail above, the '402 Accused Products determine which events users are eligible to participate in based on the geographic location of the device and other criteria. For example, the DraftKings Daily Fantasy Sports Application running on users' devices receives information related to one or more events, including information based on a geographic location

202

of the device.  DraftKings uses GPS, Bluetooth, Wi-Fi location services to determine the location of a device, and present contests that a user is eligible to join.

451.    In addition to location-based offerings, Daily Fantasy determines users' eligibility to participate in specific events based on the users' time on the platform, skill, and participation level.  For example, Daily Fantasy offers "Beginner Contests" which are available to players who have participated in fewer than 50 contests and have not earned an experience badge, allowing new users to compete against other beginners and avoid more skilled "sharks" who might otherwise dominate contests.  Similarly, DraftKings offers "Casual Contests" which are intended for players who have played over 50 contests but have not yet earned an experience badge, offering a space where intermediate players can continue to improve without facing highly skilled veterans. Exs. 66, 67, 68.



Ex. 66 (Screenshot of exemplary Beginner Contest from DraftKings' website).

452.    The '402 Accused Products allows users to choose a league, team, lineup and place bets, which are user event selections.   For example, DraftKings Daily Fantasy allows users to create one or more lineups and enter the lineups into multiple contests.  Each line up can be entered into a different competition.  Below are screenshots of DraftKings' Daily Fantasy Application (in the example, on an Apple device) showing that DraftKings Daily Fantasy allows a user to compete in distinct contests for each line up.  In the screenshot below, the user entered the "NBA $2 Double Up" and "NBA $20K And-One" contests with different line ups.  These contests will occur simultaneously and begin "TODAY AT 4:30 PM PST."



(screenshot from the DraftKings Daily Fantasy app).  Similarly, with respect to Pick6, a user can enter two different contests with different line up.  This is confirmed by the different contest IDs shown.



(screenshots of the DraftKings Pick6 app showing entry into multiple simultaneous selected events).



(screenshot of DraftKings Daily Fantasy App showing a user can create a lineup to enter into contests).



(screenshot of DraftKings Daily Fantasy App showing a user can enter the same lineup into other contests).

 

(screenshot of DraftKings Daily Fantasy App showing a user can enter the same contest with a different lineup).

(screenshot of DraftKings Daily Fantasy App showing a user can enter a different contest with a different lineup).

453.    Similarly, below are screenshots of DraftKings' Pick6 game showing that a user can create a lineup to join a competitive group, that can be used in different contests.





(screenshot of DraftKings Pick6 App showing a user can create a lineup for entry into a contest).

(screenshot of DraftKings Pick6 App showing a user can enter the lineup into multiple contests).







(screenshot of DraftKings Pick6 App showing the current lineup and allowing a user to "Play For More.").

(screenshot of DraftKings Pick6 App showing that users can enter into additional contests with the same lineup by increasing their entry fee).





(screenshot of DraftKings Pick6 App showing a non-exhaustive list of the additional contests made available to the user with the increase in entry fee).

(screenshot of DraftKings Pick6 App showing a user can create another lineup to enter other contests.).

454.    These contests are scored separately and simultaneously, as shown below.

210





(screenshot of the live 'My Contests' tab where the live standings are shown).

(screenshot of the live 'My Picks tab where the live standings are shown as the events are separately and simultaneously scored).

455.     DraftKings '402 Accused Products use lockout signals to ensure the integrity of the events.  For example, in the Pick6 App, if users attempt to finalize their submission after the lockout signal is sent and the app will not allow the users to submit a new submission or modify their picks (thereby preventing further additional user input).



(screenshot displaying an error message
when the user attempts to submit picks
after the lockout signal has been sent).

456.    The '402 Accused Products provide updates of simultaneous scoring results.
DraftKings DFS gives users access to the GameCenter where "[e]ach contest's GameCenter
provides all relevant information about the contest, from entry before the contest locks through the
final results." Ex. 72 (GameCenter – Overview (US)). The GameCenter provides real-time
standings and scoring for all contests a user is participating in.

457.    The GameCenter provides "a snapshot of the current standings (up to the top 500
entries) for the contest in progress, or the recap of the results for the completed contests." *Id.* "For
contests that include more than 500 entries, each Team Name will be listed up to the 500th position,

and after that only the last place Team Name for each prize tier will be listed."  Ex. 73 (Can I see my contest standings compared to others in GameCenter? (US)).  "For contests in progress, the standings will be updated regularly, and you'll see changes in rank as points are accumulated in real time."  *Id.*  "For contests that have been marked as completed, the standings DFS will show each entry's final rank and prize position."  *Id.*

     458.    Standings include the information in the screenshot below.



Ex. 72 (GameCenter – Overview (US)).

     459.    Users can also view their standings directly in the DraftKings DFS.  For example, in the screenshot on the left, a user has entered into multiple contests and is shown their standings to the right of the entry.  In the screenshot on the right, a user can view their ranking against all participants after selecting a specific contest.




(screenshot of the live 'My Contests' tab where the live standings are shown).

(screenshot of the live 'My Contests' tab where the live standings are shown).

460.     The DraftKings Pick6 App also provides live standings for users' Pick6 lineup contests.




(screenshots of the live 'My Picks' tab where the live standings are shown).

461.     DraftKings DFS also provides the final results of contests.  In the Pick6 screenshot

below, the DraftKings Pick 6 App summarizes all of the Pick6 line ups a user submitted.  A review

of the first line up shows that the player had a $0.00 winnings.



Ex. 74 (How do I view my Pick 6 results?); Ex. 75.

462.    After selecting the Total Entry dropdown, users can choose to review a breakdown of the results from their individual contests.




(screenshots of the individual contest results).

463.    Thus, DraftKings' '402 Accused Products satisfy all elements of exemplary Claim 1 of the '402 Patent.

464.    DraftKings' direct infringement of the '402 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

465.    The USPTO issued U.S. Patent Application No. 17/716,311 as the '402 Patent on April 9, 2024.  For the reasons discussed above in the Section entitled DraftKings' Knowledge of the Asserted Patents, DraftKings became aware of the '402 Patent and aware that its activities concerning the '402 Accused Products infringed the '402 Patent no later than upon its issuance on April 9, 2024.  At the very least, DraftKings became aware of its infringement of the '402 Patent

from its receipt of this Complaint. DraftKings' pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '402 Patent.

466.    DraftKings' infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

467.    As discussed above, DraftKings acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '402 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285. WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' direct infringement of the '402 Patent.

## COUNT XVI
### (Indirect Infringement of U.S. Patent No. 11,951,402)

468.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

469.    As set forth above, DraftKings has had knowledge of its infringement of WinView's '402 Patent since at least as early as April 9, 2024 and has further knowledge of the '402 Accused Products' infringement of the '402 Patent from the filing of this Complaint.

470.    As set forth above, DraftKings' customers directly infringe the '402 Patent when they use the '402 Accused Products. DraftKings has induced and continues to induce its customers' and end users' direct infringement of one or more claims of the '402 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and

abetting, assisting, encouraging, instructing, directing, requiring, and guiding its customers and end users to directly infringe one or more claims of the '402 Patent.

471.    For example, DraftKings knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the Accused Products.

472.    DraftKings engages in such encouragement by providing new and existing customer promotions and incentives, instructions, guidance regarding the use and troubleshooting, how to and strategy guides, videos, and tutorials, which direct and indirectly facility the use of the Accused Products.

473.    As discussed in more detail above with respect to the '770 Patent, DraftKings encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '402 Accused Product, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '402 Accused Product in an infringing manner.

474.    As discussed above, DraftKings also actively markets its Accused Products through several channels, including social media advertisements, sponsored content, in-casino advertisements, billboards, DraftKings' websites, and traditional media.

475.    DraftKings' marketing aims to recruit new customers, reengage former customers, and retain current customers via different marketing strategies.  Ex. 13 at 60-61 (DraftKings 10-K) ("We grow our business by attracting new paid users to our product offerings and increasing their level of engagement with our product offerings over time.  To effectively attract and retain paid users and to re-engage former paid users, we invest in a variety of marketing channels in combination with personalized customer promotions, most of which can be used across all of our

product offerings (such as free contest entries or bets or matching deposits). These investments and personalized promotions are intended to increase consumer awareness and drive engagement.").

476.   All the elements of the claims are used by either DraftKings, their customers, purchasers, users, developers, vendors, and manufacturers, or some combination thereof. DraftKings has known or has been willfully blind to the fact that they are is inducing others to infringe by practicing, either themselves or in conjunction with DraftKings, one or more claims of the '402 Patent.

477.   DraftKings has also contributorily infringed and continue to contributorily infringe one or more claims of the '402 Patent pursuant to of 35 U.S.C. § 271(c), and with knowledge or willful blindness by selling and offering to sell within the United States the '402 Accused Products, without authority, which constitute materials and apparatuses for practicing the claimed invention of one or more claims of the '402 Patent, such materials and apparatuses constituting material components of the inventions of the '402 Patent and not staple articles or commodities of commerce suitable for substantial non-infringing uses. For example, WinView is informed and believes, and on that basis alleges, that DraftKings has knowledge that the DraftKings Daily Fantasy and Pick6 websites and mobile applications constitute material parts of the inventions of the '402 Patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are used in an infringing manner. In particular, DraftKings know that the '402 Accused Products are software programs that are only used with customers' computer devices in order to wager through Daily Fantasy and Pick6 which always infringe, as discussed above.

478.    To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

479.    DraftKings' indirect infringement of the '402 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

480.    DraftKings' indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

481.    DraftKings' indirect infringement of the '402 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.

482.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' indirect infringement.

## COUNT XVII
### (Direct Infringement of U.S. Patent No. 12,005,349)

483.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

484.    In violation of 35 U.S.C. § 271(a), DraftKings directly infringed and continues to directly infringe the '349 Patent, including without limitation exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States DraftKings Sportsbook and Casino, DraftKings Casino, and DK Horse (the "'349 Accused Products").

485.    As set forth above in the Section entitled The Parties, Defendants DraftKings Inc., DK Crown Holding, Crown Gaming, SBTech US, and SBTech Global operate as a single,

consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

486.    DraftKings' acts of making, using, importing, selling, and offering for sale the infringing '349 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, DraftKings declined WinView's request that DraftKings partner with WinView.

487.    DraftKings' infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

488.    DraftKings owns and controls the operation of the '349 Accused Products and generates substantial financial revenues therefrom.  DraftKings puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '349 Accused Products are hosted on AWS servers, as discussed above, DraftKings controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '349 Accused Products in order to generate revenue.

489.    To the extent DraftKings' customers, purchasers, users, developers, vendors, and manufacturers direct and control the devices and methods in the claims, DraftKings obtains benefits from its control of the system as a whole.

490.    DraftKings also has directly infringed and continues to directly infringe the '349 Patent by having its employees test and use the '349 Accused Products in the United States.  In order to maintain legal compliance, DraftKings is required to periodically monitor and ensure that the '349 Accused Products are performing as designed and intended.  DraftKings further directly

infringes by marketing and distributing the '349 Accused Products, which constitutes infringing offers to sell and sales.

491.    By way of example of DraftKings' infringement of the '349 Patent, the '349 Accused Products meet all of the limitations of exemplary Claim 1 of the '349 Patent, which recites:

> 1. A method of playing a game, comprising:
>
> a. streaming video data and game data;
>
> b. operating a program to display the video data and the game data, wherein the video data and the game data are synchronized when displayed; and
>
> c. preventing users from submitting a response to the game data based on the video data and a lockout signal.

492.    The '349 Accused Products infringe the '349 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c).  For example, they are the software programmed to perform the claimed method for implementing a game, as discussed below.

493.    DraftKings allows users to bet on sports matches, daily fantasy leagues, and casino game livestreams, performing the claimed method of playing a game.  *See* Ex. 13 (DraftKings 10-K) at 3 ("We provide users with online sports betting ("Sportsbook"), online casino ("iGaming") and daily fantasy sports ("DFS") product offerings, as well as retail sportsbook, media and other consumer product offerings.").  These product offerings are available on Apple iOS and iPadOS via the Apple Store, Android via the Google Play store, and traditional and mobile websites.  *Id.* at 7.  The mobile apps offer the same product offerings as the traditional website.  The '349 Accused Products involves games of chance.  *See, e.g.*, *id.* at 61 ("Sports betting and iGaming are characterized by an element of chance.").

494.    DraftKings provides the DraftKings Sportsbook and Casino websites and the associated mobile applications.  The DraftKings Sportsbook and Casino offerings may be accessed online at sportsbook.draftkings.com and casino.draftkings.com respectively and by using the DraftKings Sportsbook and Casino Apps on mobile devices such as a smartphone, tablet, or computer.

495.    DraftKings Sportsbook provides video content streams to customers' devices operating the '349 Accused Products.  There are two types of live stream features available in DraftKings Sportsbook: "Live Stream" and "Game Tracker."  DraftKings also uses customers' geographic information to determine whether a customer can watch the live stream of a game.  If a user is within a state that allows sports betting, the user may stream the game.  For example, below is screenshot of DraftKings Sportsbook Application (in the example, on an Apple device) showing the live stream features of the DraftKings Sportsbook mobile application.





(screenshot of the video data live stream feature in the DraftKings Sportsbook app).

(screenshot of the game data "game tracker" feature in the DraftKings Sportsbook app).

496.    If the user is in a location where sports betting is not allowed, DraftKings does not allow streaming of a game.  For example, below is a screenshot of the DraftKings Sportsbook app on an Apple device displaying notification that live streaming is not available for the customer's location.



(screenshot of DraftKings Sportsbook App notification stating that live streaming is not available for the location).

497.    Similarly, a user is unable to view the Game Tracker where a location cannot be verified and the Game Tracker is available.



(screenshot of DraftKings Sportsbook website not displaying the game tracker when the customer's location cannot be verified).

498.    DraftKings Casino provides video data and game data streams to devices based on the customer's geographic location.  Specifically, DraftKings Casino also uses the geographic information to determine whether a user can watch the live stream of a game.  If a user is within a state that allows iGaming, the user will have access to the live stream of a game.



(screenshot of the DraftKings Casino app showing streaming video data and game data for a live roulette game).

499.    If a user is in a jurisdiction that does not allow iGaming, the DraftKings Casino app will prevent the user from accessing the stream.  For example, below is a screenshot of the DraftKings Casino app on an Apple device showing preventing a customer from accessing a casino game because of the geographic restrictions.

228



(screenshot of the DraftKings Casino app stating that it is blocking the casino based on the customer's location).

500.    As shown above, DraftKings operates cellular-based programs to allow the '349 Accused Products to display the streamed video and game data for sporting and casino games. Customers then make selections related to events that occur within the streaming content. DraftKings provides betting options on the Sportsbook app that reflect the online broadcast of the sporting events and offers live betting propositions, including a prop bet that can be made while a sporting event is underway.  Thus, DraftKings Sportsbook allows users to make wagers while the

live sporting event is being played and streamed.  DraftKings updates the odds and propositions as the action unfolds and in accordance with what happens in the live sporting event.  DraftKings also removes betting propositions that have been resolved and adds new betting propositions as the sporting event progresses.  For example, the screenshot below depicts DraftKings Sportsbook mobile application providing Puck Line odds for the hockey match between Biel and Lausanne. Puck Line is akin to a point spread bet as used in other sports like basketball and football.  As shown in the screenshot, the Biel are +1.5 underdogs on the puck line (spread), while Lausanne are -1.5 favorites.  DraftKings also allows a user to bet on the total (over/under) of goals scored.



(screenshot of live stream operation of DraftKings Sportsbook App).



Ex. 51 (What is a Prop Bet?)

501.    DraftKings provides gameplay in its Casino app that reflects the real-world dealer's table.  Thus, the DraftKings Casino emulates the casino experience of a live dealer while remote.  For example, a customer playing blackjack makes selections related to events that occur within the blackjack stream.  Selections may include the decisions to bet, hit, stay, and split.



(screenshot of the live stream feature in the
DraftKings Sportsbook app).

502.    DraftKings uses its servers and AWS Cloud servers to provide synchronized game

data through their applications, as discussed above. This content delivery can occur via cellular

connection as illustrated in the screenshots below where the network connection is an LTE

network.





(screenshot of the game tracker feature in the DraftKings Sportsbook app operating over a cellular connection).

(screenshot of DraftKings Casino App showing a game of roulette operating over a cellular connection).

503.    In addition, DraftKings presents the online broadcast of content and synchronized game data.  Users accessing the same page of the DraftKings Sportsbook website or same portion of the mobile application are presented with the same content, including available sports, betting propositions, game scores, and statistics.  DraftKings updates the odds and betting propositions in accordance with how the live sporting event is being played out in the online broadcast of content. DraftKings presents the online broadcast of content depicting what is happening in the sporting event with the synchronized game data constituting, for example, updated odds and propositions in the Sportsbook application.

504.    DraftKings sends a lockout signal to prevent customers from entering untimely selections.  To do so, DraftKings utilizes a person physically attending the events to determine

when to trigger the lockout signal.   *See, e.g.*, Powering Our Sportsbook Product (https://www.youtube.com/watch?v=qr5HR_vvSWw) at 9:45-10:46.   DraftKings Sportsbooks betting works as a "shopping cart."   Players can place bets before or during the game.   Upon triggering a lockout signal, a bet becomes unavailable, the odds offering will turn converted to a greyed-out lock symbol and the player will not be able to add this selection to the bet slip, and the user will receive a notification that the bet is closed.

505.   Below are screenshots of DraftKings' Sportsbooks App, showing a cart before and after a bet is closed.




(screenshot of DraftKings Sportsbook App showing a cart before a bet is closed).

(screenshot of DraftKings Sportsbooks App showing a cart after a bet is closed).

506.    Similarly, with respect to DraftKings Casino, customers are prevented from placing a bet after the lockout signal is sent.  Thus, DraftKings' '349 Accused Products satisfy all elements of exemplary Claim 1 of the '349 Patent.

507.    DraftKings' direct infringement of the '349 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

508.    The USPTO issued U.S. Patent Application No. 17/488,674 as the '349 Patent on June 11, 2024.  For the reasons discussed above in the Section entitled DraftKings' Knowledge of

the Asserted Patents, DraftKings became aware of the '349 Patent and aware that its activities concerning the '349 Accused Products infringed the '349 Patent no later than upon its issuance on June 11, 2024. At the very least, DraftKings became aware of its infringement of the '349 Patent from its receipt of this Complaint.

509. DraftKings' pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '349 Patent.

510. DraftKings' infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

511. As discussed above, DraftKings acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '349 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285. WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' direct infringement of the '349 Patent.

## COUNT XVIII
### (Indirect Infringement of U.S. Patent No. 12,005,349)

512. WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

513. As set forth above, DraftKings has had knowledge of its infringement of WinView's '349 Patent since at least as early as June 11, 2024 and has further knowledge of the '349 Accused Products' infringement of the '349 Patent from the filing of this Complaint.

514.    As set forth above, the '349 Accused Products directly infringe the '349 Patent. DraftKings has induced and continues to induce its customers' direct infringement of one or more claims of the '349 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '349 Patent by using the '349 Accused Products.

515.    DraftKings knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '349 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '349 Accused Products are used to gamble, they necessarily infringe the '349 Patent.  Therefore, DraftKings' encouragement of its customers to use the '349 Accused Products to gamble necessarily encourages its customers to directly infringe the '349 Patent.

516.    As discussed in more detail above with respect to the '770 Patent, DraftKings encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '349 Accused Products, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '349 Accused Products in an infringing manner.

517.    All the elements of the claims of the '349 Patent are used by DraftKings and its customers, purchasers, users, developers, vendors, and manufacturers, or a combination thereof. As set forth above, DraftKings has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with DraftKings, one or more claims of the '349 Patent.

518.    DraftKings also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '349 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, DraftKings has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '349 Accused Products within the United States, without authority from WinView, it is providing the '349 Accused Products which are material components of the systems infringing one or more claims of the '349 Patent. The '349 Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses. As discussed above, when the '349 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '349 Patent.

519.    DraftKings' indirect infringement of the '349 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

520.    DraftKings' indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

521.    DraftKings' indirect infringement of the '349 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

522.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for DraftKings' indirect infringement.

## PRAYER FOR RELIEF

WHEREFORE, WinView prays for judgment and relief against DraftKings as follows:

A.       an entry of judgment holding that DraftKings has willfully infringed and is willfully infringing, has induced infringement of and is inducing infringement of, and has contributed to and is contributing to infringement of each of the Asserted Patents;

B.       a preliminary and permanent injunction against DraftKings and its officers, employees, agents, servants, attorneys, instrumentalities, and/or those in privity with them, from infringing, inducing infringement, and contributing to infringement of the Asserted Patents and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

C.       an award to WinView of such damages as it shall prove at trial against DraftKings that is adequate to fully compensate WinView for DraftKings' infringement of each of the Asserted Patents that will account for infringement up to trial based on the relevant information and financial data produced, where said damages will be no less than a reasonable royalty;

D.       an award to WinView of increased damages under 35 U.S.C. § 284 based on, *inter alia*, DraftKings' willful infringement;

E.       a finding that this case is exceptional and an award to WinView of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

F.       an award of prejudgment interest, post-judgment interest, and costs under 35 U.S.C. § 284;

G.       an accounting of all infringing sales and revenues from the first date of infringement; and

H.       such other and further relief, including equitable relief, as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), WinView hereby demands a trial by jury on all issues triable to a jury.

Respectfully submitted,

Dated: February 10, 2025

By: *s/ Jonathan S. Caplan*

Paul J. Andre (*pro hac vice* to be filed
Lisa Kobialka (*pro hac vice* to be filed)
James Hannah (*pro hac vice* to be filed)
Jennifer L. Gilbert (*pro hac vice* to be filed)
Carlos J. Tirado (*pro hac vice* to be filed)
**KRAMER LEVIN NAFTALIS**
**& FRANKEL LLP**
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel.: (650) 752-1700
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
jgilbert@kramerlevin.com
ctirado@kramerlevin.com

Jonathan S. Caplan
Aaron Frankel (*pro hac vice* to be filed)
**KRAMER LEVIN NAFTALIS**
**& FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
Tel.: (212) 715-9100
jcaplan@kramerlevin.com
afrankel@kramerlevin.com

*Attorneys for Plaintiff*
WinView IP Holdings, LLC

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff, by its undersigned counsel, hereby certifies pursuant to Local Civil Rule 11.2 that the matters in controversy are not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding, with the exception of:

*WinView Inc. v. DraftKings Inc.*, Civil Action No. 21-13405 (ZNQ) (DEA) (D.N.J. July 7, 2021), which involves the same parties but not the same asserted patents;

*WinView Inc. v. FanDuel Inc.*, Civil Action No. 21-13807 (ZNQ) (DEA) (D.N.J. July 19, 2021), which involves WinView but not the same asserted patents; and

*WinView Inc. v. FanDuel Inc.*, filed concurrently with this Complaint, which involves the same Asserted Patents.

Respectfully submitted,

Dated: February 10, 2025

By:  *s/ Jonathan S. Caplan*
Paul J. Andre (*pro hac vice* to be filed)
Lisa Kobialka (*pro hac vice* to be filed)
James Hannah (*pro hac vice* to be filed)
Jennifer L. Gilbert (*pro hac vice* to be filed)
Carlos J. Tirado (*pro hac vice* to be filed)
**KRAMER LEVIN NAFTALIS**
 **& FRANKEL LLP**
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel.: (650) 752-1700
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
jgilbert@kramerlevin.com
ctirado@kramerlevin.com

Jonathan S. Caplan
Aaron Frankel (*pro hac vice* to be filed)
**KRAMER LEVIN NAFTALIS**
 **& FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
Tel.: (212) 715-9100

jcaplan@kramerlevin.com
afrankel@kramerlevin.com

*Attorneys for Plaintiff*
WinView IP Holdings, LLC